TRACY NEMET & another[1] *vs.* BOSTON WATER AND SEWER
COMMISSION & another.[2]

No. 02-P-159.

Suffolk. May 29, 2002. - September 26, 2002.

·    Present: LENK, DREBEN, & McHUGH, JJ.

*Negligence,* Water pipe, Causation, Expert opinion. *Sewer. Municipal Corpora-
tions,* Sewers, Liability for tort. *Evidence,* Expert opinion. *Massachusetts
Tort Claims Act.*

In an action seeking damages for flooding on the plaintiffs' property that was
allegedly caused by the defendants' negligent failure to maintain a drain
pipe that ran underneath the plaintiffs' backyard, the evidence was suf-
ficient to permit a reasonable jury to conclude that water from the broken
pipe, as opposed to torrential rainfall, was an operative and potent factor in
causing the flood damage, and that the defendants' conduct (i.e., their
failure to act despite knowledge of the pipe's defective condition) was a
substantial legal factor in bringing about the harm. [107-109]

In an action seeking recovery for property damage due to flooding that was al-
legedly caused by the defendants' negligence, the defendants failed to
demonstrate that expert testimony was required as a matter of law to show
causation in all flood cases, or that, even if not categorically required, the
circumstances of their particular case — in which the plaintiffs presented
other evidence sufficient to permit the jury reasonably to conclude that the
defendants were negligent — required such expert testimony. [109-110]

In an action seeking recovery for property damage due to flooding caused by
the negligence of the defendant municipalities, the trial judge did not err in
applying, on a "per plaintiff" basis, the statutory cap on damages contained
in the Massachusetts Tort Claims Act, G. L. c. 258, § 2, where the
plaintiffs, as coowners of real property, had separate undivided interests in
the land and were entitled to recover for their individual injuries, i.e., the
damage to his or her separate proportionate interest in the property
[110-114]; further, there was no merit to the defendants' argument that one
plaintiff, who acquired an interest in the property after the start of flooding
problem, when the property still held some value, should be barred from
recovery [114-115].

---

[1]Christine Nemet.

[2]Town of Dedham. (The Dedham department of public works is named in
the complaint, but the parties stipulated that the department has no independent
legal status, and that whenever the department is referred to in the complaint,
it shall be deemed to be the town of Dedham.)

CIVIL ACTION commenced in the Superior Court Department on February 17, 1999.

The case was tried before *Linda E. Giles*, J., and a motion for judgment notwithstanding the verdict, a new trial, or remittitur was heard by her.

*Bonnie M. Gottschalk* for Boston Water and Sewer Commission.

*John J. Davis* for town of Dedham.

*Robert D. Cohan* for the plaintiffs.

LENK, J. The plaintiffs, Tracy and Christine Nemet, moved into their Dedham home on May 16, 1997.[3] From that time until the commencement of this action in 1999, the Nemets' residence was beset with serial flooding that caused significant damage to their real and personal property. The Nemets contend that the flooding was caused by the defendants' negligent failure to maintain a drain pipe that ran underneath the Nemets' backyard. That pipe was installed in the late 1950's as a joint project of the Dedham department of public works (DPW) and the Boston water and sewer commission (BWSC). While physically located on Dedham land, the pipe was to serve as a "temporary outlet" for Boston water.

After trial by jury, the defendants were each found liable in negligence and each plaintiff was awarded damages on an individual basis.[4] The trial judge thereafter reduced Tracy Nemet's award against DPW to $100,000 by virtue of the applicable limitation on damages contained in the Massachusetts Tort Claims Act (Act), G. L. c. 258, § 2. The judge later denied the defendants' motions for judgment notwithstanding the verdict (JNOV), new trial, and remittitur. On appeal from the denial of these posttrial motions the defendants assert error in three respects: (1) the Nemets failed to prove the essential element of causation; (2) the Nemets failed to introduce competent evidence

---

[3]At the time they moved in, Tracy Nemet was the sole owner listed on the deed. On July 23, 1998, he conveyed the property to himself and Christine Nemet as tenants by the entirety and to Diane Casaceli, his mother-in-law, as a joint tenant.

[4]Tracy Nemet was awarded $96,750 against BWSC and $118,250 against DPW. Christine Nemet was awarded $78,650 against BWSC and $96,250 against DPW.

to prove the element of causation; and (3) the trial judge erred in her application of the statutory cap. We affirm.

1. *Causation.* The defendants contend that there are two ways in which the Nemets failed to prove causation: they did not introduce sufficient evidence that the water causing damage to their home in fact came from the defendants' pipe, and they did not introduce any evidence showing that it was the defendants' negligent conduct that caused the flooding. We consider each contention in turn, mindful that, in reviewing the denial of a JNOV motion, we are required to "tak[e] into account all the evidence in its aspect most favorable to the plaintiff[s] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff[s]." *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983).

We first summarize the evidence favorable to the Nemets that was before the jury. On June 13, 1998, the date of the most serious of seven floods, the Nemets' basement filled with six feet of water in less than two hours. In an attempt to determine the source of the water, Tracy Nemet used a boat to paddle out to the backyard where he saw water bubbling from the ground. A week later, after the water receded, he observed two holes in the ground at the location where he had seen bubbling and deduced that the pipe running under his house caused the damage. In addition to Nemet's testimony in this regard, the jury were shown photographs and a videotape of the damaged pipe.

The jury also had before them a 1957 memo from Robert Shea, sewer division engineer for the Boston public works department,[5] setting forth a proposal to install underground a 24-inch pipe on what is now the Nemets' property. According to the memo, the pipe was designed to serve as a "temporary outlet." Paul Barden, deputy director of engineering services at BWSC, testified that a temporary outlet is not likely to function for more than ten years. The jury heard as well that the pipe was not altered or replaced until the year 2000, approximately

---

[5]The water and sewer divisions of the city of Boston public works department went on to become the Boston water and sewer commission.

forty years after installation, and that, upon replacement of the pipe, the flooding stopped.

There was evidence that the defendants knew that the pipe was damaged in advance of the June, 1998, flood. DPW commissioner Keane testified that, in 1996, he had seen holes in the pipe that were six to eight inches in diameter and that it was reasonable to conclude that water was escaping the pipe. He reported these earlier findings in a memo to his boss after the June, 1998, flooding, stating that the pipe had "open joints" and was in need of cleaning and repair. Barden of the BWSC testified that he also had seen holes in the pipe three months before the June, 1998, flooding and had reason to believe that water was escaping from the pipe.

Further, the Nemets' property was the only property in the surrounding area to have suffered flooding damage. In this regard, the jury heard Keane's testimony that no one in the surrounding area had complained of flooding, and Tracy Nemet's testimony that, after his property flooded, he surveyed neighboring properties and observed that none of them had such water problems.

The defendants, however, claim that causation was not proven because the evidence did not show that water from the broken pipe, as opposed to torrential rainfall, was a substantial factor in causing damage.[6] In so arguing, the defendants call our attention to *Alholm* v. *Wareham*, 371 Mass. 621, 626 (1976), where the plaintiffs, who were injured in a multicar accident, sued the defendant municipality under the theory that the smoke released by its negligently operated dump decreased the other drivers' visibility, thereby causing the accident. *Id.* at 623. The plaintiffs had not presented any evidence concerning the amount of smoke released from the dump or its specific effects on visibility, and "evidence . . . regarding the presence of an extremely heavy fog was overwhelming." *Id.* at 627. Because the evidence was not sufficient to permit a reasonable jury to infer that the smoke from the dump was more likely to have caused an automobile

---

[6]The defendants did not themselves offer evidence to support their alternative theory of causation that the flooding the Nemets experienced was caused by a combination of torrential rainfall and the location of the Nemets' property in a low-lying area susceptible to floods.

accident than the dense fog, the jury could not conclude that the smoke was "an operative and potent factor" in causing the accident. Hence, a verdict was correctly directed for the defendant. *Id.* at 627-628.

The situation here, however, is quite otherwise. Unlike the smoke in *Alholm*, there was evidence concerning the specific effects of the damaged pipe on the Nemets' property. Such evidence includes Keane's testimony to the effect that there were six to eight inch holes in the pipe and that it was "reasonable to conclude that water was coming out of that pipe from the holes," the Nemets' testimony as to their observations of conditions in the yard, documentary evidence as to the conditions, as well as evidence received without objection that the flooding ceased once the pipe was removed from the Nemets' yard in 2000. This evidence, viewed in the light most favorable to the Nemets, was sufficient to permit a reasonable jury to conclude that the water from the pipe was an "operative and potent factor" in causing the flood damage. See *id.* at 627. Moreover, unlike *Alholm*, the defendants' alternative causal explanation for the flooding, i.e., torrential rainfall plus topography, was far from "overwhelming." *Ibid.* The plaintiffs were not required in any event to exclude all possibility that the damages resulted without the fault of the defendants, and the weakness of the alternative causal explanation only serves further to underscore the reasonableness of the jury's conclusion that the pipe was an "operative and potent factor." *Ibid.* See *McLaughlin* v. *Bernstein*, 356 Mass. 219, 226 (1969).

The second prong of the defendants' attack on the plaintiffs' proof of causation is that, even if it were established that the water causing the damage came from the pipe, the Nemets' evidence did not suffice to show that the defendants' conduct was a substantial legal factor in bringing about the alleged harm. Contrast *Tritsch* v. *Boston Edison Co.*, 363 Mass. 179, 182 (1973). Otherwise put, the defendants argue that, just because a pipe broke and flooding thereafter occurred, they are not automatically liable for damages. Instead, they claim, the Nemets must prove it more likely than not that the defendants' specific action or inaction caused the damage to the Nemets' property. The Nemets did not meet their burden, say the

defendants, because the Nemets neither knew how the pipe broke nor are they qualified to advance such an opinion.

The defendants' argument is wide of the mark, ignoring as it does the well-settled principle that a municipality "is responsible for damages which accrue to individuals through negligence in construction, *maintenance* or operation of its system of sewers" (emphasis added). *Lobster Pot of Lowell, Inc.* v. *Lowell*, 333 Mass. 31, 33 (1955), quoting from *Pevear* v. *Lynn*, 249 Mass. 486, 488 (1924). It is undisputed that the defendants owed the Nemets a duty to maintain the pipe at issue.[7] It was the Nemets' burden, then, to produce evidence sufficient for a jury reasonably to conclude that the municipalities breached their duty to maintain the pipe and that such breach caused the Nemets damage. The Nemets met this burden by producing evidence that the pipe, many years past its expected life, was leaking and that both defendants, despite having actual knowledge of its defective condition, failed to act before the serious flooding occurred.

2. *Competency of evidence to establish causation.* The defendants' second claim of error in the denial of their motions for JNOV and new trial concerns the Nemets' failure to introduce expert testimony. They argue that this evidentiary shortcoming precluded the jury from reasonably inferring causation because the bursting of the pipe and subsequent flooding are outside the jury's "general knowledge of practical affairs." Contrast *Toppin* v. *Buzzards Bay Gas Co.*, 348 Mass. 397, 401 (1965). The defendants maintain, on the one hand, that expert testimony is required as matter of law to show causation in all flood cases and, on the other, that even if not categorically required, the circumstances in this case nonetheless require expert testimony.

Notably, our attention has not been called by the defendants to any Massachusetts appellate authority that mandates expert testimony in a simple negligence action. The defendants instead

---

[7]On June 30, 2000, when denying the defendants' summary judgment motions, the judge stated that the "BWSC and/or Dedham owed a duty of care to the Nemets, to maintain and repair the piping system which they installed under G. L. c. 83, § 1." The defendants neither challenged this at trial nor question its correctness on appeal.

attempt to characterize the Nemets' claim as one grounded in the law of design defect and then argue that the Nemets failed to meet the greater evidentiary burden required in cases of that nature. See *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97, 104 (1988); *Enrich* v. *Windmere Corp.*, 416 Mass. 83, 87 (1993). Because the Nemets' claim is not properly so characterized, the defendants' contention stumbles at the gate.

Moreover, in cases not involving a specific technical defect, as here, our courts have been reluctant to say that a particular subject matter is outside the "common knowledge or common experience of the jury," thus requiring expert testimony as a matter of law. *Commonwealth* v. *Francis*, 390 Mass. 89, 98 (1983). See *Adams* v. *United States Steel Corp.*, 24 Mass. App. Ct. 102, 105 (1987). Compare *Providence & Worcester R.R.* v. *Chevron U.S.A., Inc.*, 416 Mass. 319, 323 (1993). We are also persuaded by the reasoning of courts in other States that have considered whether expert testimony is required as matter of law to establish causation in flooding cases and have concluded that it is not. See *Moore* v. *Associated Material & Supply Co.*, 263 Kan. 226, 242-243 (1997); *Tarrant Regional Water Dist.* v. *Gragg*, 43 S.W.3d 609, 618 (Texas Ct. App. 2001).

Finally, because we have already decided that the evidence presented was sufficient to permit the jury reasonably to conclude that the municipalities were negligent, we discern no merit in the defendants' contention that the totality of the circumstances here required more, specifically expert testimony, to prove causation.

3. *The application of the statutory cap.*[8] The third claim of error that the defendants press on appeal concerns the trial judge's application of the statutory cap on a "per plaintiff" basis. Otherwise put, they maintain that the cap should have been applied to the entirety of the damages awarded to both

---

[8]The Nemets argue that the defendants' challenge to the application of the statutory cap was not properly preserved for appeal. Our review of the record persuades us that all parties understood that the cap would be applied by the trial judge after the jury verdict and that the JNOV motion was effectively the defendants' first opportunity to object to the manner in which it was applied. Contrast *Primus* v. *Galgano*, 187 F. Supp. 2d 1 (D. Mass. 2002) (court refused to apply a tort cap after the defendants strategically omitted it from their proposed jury instructions).

Nemets, i.e., that the couple's combined total recovery against each defendant should be limited to $100,000. The defendants argue in this regard that *Irwin* v. *Ware*, 392 Mass. 745, 766 (1984), is not controlling because distinguishable insofar as it involved personal injury suffered by individuals whereas this case involves property damage constituting a single common loss. They contend that applying the cap separately to each plaintiff frustrates a major purpose of the Act, which is to protect municipalities from unlimited liability. Finally, they argue that, even if it were proper to apply the cap separately to each of the Nemets, Christine Nemet should not be able to recover for damages to the real property because she was not a legal owner at the time of loss.

By virtue of the Act, the Commonwealth waives its sovereign immunity, thereby enabling plaintiffs to bring negligence actions against governmental entities. The Act, however, limits recovery against public employers to $100,000. G. L. c. 258, § 2.[9] The Act serves two competing purposes: first, to allow plaintiffs with valid claims to recover for injuries caused by negligence on the part of a governmental entity, and second, to protect the "stability and effectiveness of government" by providing a mechanism that allows for recovery, without subjecting the government to unlimited liability. *Vasys* v. *Metropolitan Dist. Commn.*, 387 Mass. 51, 57 (1982). The $100,000 cap serves the second purpose.

In *Irwin* v. *Ware, supra,* four people sued to recover for personal injuries suffered in an automobile accident that resulted from a municipality's negligence. In determining how the statutory cap would be applied, the court recognized that the statu-

---

[9]The relevant part of the Act states:

"Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable to levy of execution on any real and personal property to satisfy judgment, and shall not be liable for interest prior to judgment or for punitive damage or for an amount in excess of one hundred thousand dollars."

G. L. c. 258, § 2, as inserted by St. 1978, c. 512, § 15.

tory language alone did not settle the matter and examined three proffered alternatives: the "per plaintiff" basis, the "per claim" basis, and the "per incident" basis.[10] Taking into account the language and structure of the Act, the court settled upon the "per plaintiff" alternative as best furthering both of the statute's competing purposes. See *Irwin* v. *Ware*, 392 Mass. at 766-773.

The defendants think *Irwin* distinguishable, however, because injury to jointly owned property and not personal injuries is at issue here. They argue that, unlike the case with a personal injury which, of necessity, is suffered on an individual basis, when a property loss occurs, irrespective of how many individuals own the property, there is but a single loss shared in common by its owners. Permitting separate per owner caps for a single shared loss, they argue, is the equivalent of allowing a single personal injury plaintiff to recover separately for multiple claims, an idea explicitly rejected by the *Irwin* court. *Ibid.* Further, they argue that allowing joint property owners to enjoy separately applied caps both would produce anomalous results that are capriciously dependent upon the number of owners a parcel of damaged property may have, and would result in "inflated" recoveries that frustrate the purpose of protecting the government from unlimited liability.

As an initial matter, we think unfounded the defendants' premise that the Nemets suffered a single common loss. In general, coowners of real property, whether tenants in common or joint tenants, have separate undivided interests in the land. See *Codman* v. *Wills*, 331 Mass. 154, 155, 158 (1954); *Moat* v. *Ducharme*, 28 Mass. App. Ct. 749, 751 (1990). Holding such a separate interest permits one cotenant to bring suit against a third party without being required to join other cotenants as necessary parties. See *Codman* v. *Wills*, 331 Mass. at 159. See also Mass.R.Civ.P. 19, 365 Mass. 765 (1974); Mass.R.Civ.P. 20, as amended, 365 Mass. 766 (1974). However, the cotenant

---

[10]The "per plaintiff" basis allows each plaintiff in a negligence case to collect up to $100,000 for his or her injuries. The "per incident" basis means that the liability of the public employer is capped at $100,000 for the entire act of negligence; that amount is to be shared by all plaintiffs injured by virtue of that incident. The "per claim" basis allows a single plaintiff to collect up to $100,000 for each successful cause of action asserted against a public employer. See *Irwin* v. *Ware*, 392 Mass. at 766-773.

bringing the action is permitted to "recover for damages only to [his or her] interest[]." *Codman* v. *Wills, supra* at 159. Complete recovery for all property damage from a third party is thus to be had when all cotenants, either in the same or separate lawsuits, sue to recover for damage to their separate proportionate interests in the property. "Hence their damage would be the proportion that their interest in the fee bears to the whole." *Ibid.* The "per plaintiff" basis for application of the cap is accordingly quite appropriate because, as in *Irwin*, there are individual injuries, i.e., each plaintiff's proportionate interest in the damaged property.[11]

To the extent that the defendants maintain that the Legislature could not have intended a "per plaintiff" basis of recovery for damage to property with more than one owner, we think the contention unpersuasive. Section 2 of the Act provides in pertinent part that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death . . . ." That both types of loss appear side by side in the same sentence is not suggestive of any legislative intent to distinguish the two injuries. Moreover, had the Legislature wished the cap to be applied differently to property losses than to personal injuries, it is reasonable to think that it would have worded the statute in that manner, as other State legislatures have done. See, e.g., Okla. Stat. tit. 51, § 154 (2001) ($25,000 cap for property damage and $125,000 for "any other loss").

Nonetheless, there is some force to the defendants' observation that the application of the cap on a per plaintiff basis carries with it the potential for anomalous results insofar as the amount of a public employer's liability for property damage will depend upon the number of owners of that property. As previously discussed, however, each owner of property that has been damaged may sue to recover for damage to his or her separate proportionate interest in the property, just as each person sustaining personal injuries in an automobile accident, as

---

[11]In raising their blanket claim that coowners suffer a single common loss, the defendants neither make mention of the fact that the Nemets hold the property as tenants by the entirety nor suggest any ramifications that this form of ownership might have. Nor do they raise any issue as to Diane Casaceli, who holds an interest as joint tenant in the property, but appears not to have joined in this action. Accordingly, we do not address such matters.

in *Irwin, supra,* may sue to recover for his or her own injuries. The latter situation also carries with it the potential for anomalous results insofar as the amount of a public employer's liability arising from an automobile accident will depend upon the number of persons who happened to be in the car and were injured. Indeed, the force of *Irwin* is not limited to accidents involving automobiles, but would extend equally to accidents involving a bus, a train, or even an office building. The court in *Irwin* recognized the risk the defendants identify but rejected the "per incident" basis of recovery that the defendants would prefer. Accordingly, we discern no error in the judge's application, in these circumstances, of the statutory cap to each of the Nemets separately.

Lastly, the defendants contend that, even if the judge did correctly apply the cap on a "per plaintiff" basis, Christine Nemet should be precluded from recovering for any damage to the real property because she was not a record owner at the time of the June, 1998, flood.[12] The defendants point to the Nemets' own testimony and correspondence from their attorneys to the effect that the house was rendered worthless following that flood, the very time when Christine Nemet became an owner of the property. Our review of the record, however, makes plain that there was also evidence to the effect that the property did have value at the time Christine Nemet became an owner, and that such value later declined as the flooding problem continued and further damage caused by structural settlement became evident. Viewing the evidence in the light most favorable to the plaintiffs and disregarding evidence favorable to the defendants, as we must, see *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 326 (1982), the jury could reasonably have concluded that the real property had value at the time Christine Nemet acquired an

---

[12]The defendants express concern that permitting Christine Nemet to recover will encourage future plaintiffs to add the names of friends and family to deeds of real property that has already sustained damage, thereby substantially increasing the total amount that may be recovered from governmental defendants. While that may prove to be a legitimate concern in some future case, it can best be addressed at that time. There is nothing in the record now before us to suggest that Christine Nemet was added to the deed so as to enhance the couple's recovery. Further, the judge instructed the jury that Christine Nemet's claim for damage to the real property did not arise until after July 23, 1998, when she became a legal owner of the property.

ownership interest and that it subsequently lost value as a result of the defendants' negligence.

*Order denying motions for new trial or for remittitur affirmed.*

*Judgments affirmed.*