# United States Court of Appeals
## For the First Circuit

No. 10-1841

BERKSHIRE MEDICAL CENTER, INC.,

Plaintiff, Appellee,

v.

U.W. MARX, INC.,

Defendant-Third Party Plaintiff, Appellant.

_____

ROCHESTER LINOLEUM AND CARPET CENTER, INC.,
d/b/a Rochester Flooring Resource,

Third Party Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Kenneth P. Neiman, U.S. Magistrate Judge]

Before
Lynch, Chief Judge,
Boudin and Thompson, Circuit Judges.

John Egan with whom Scott A. Aftuck and Rubin and Rudman LLP
were on brief for defendant-third party plaintiff, appellant.
Dennis M. LaRochelle with whom Cain Hibbard & Myers P.C. was
on brief for appellee.

July 7, 2011

**BOUDIN**, <u>Circuit Judge</u>.  This is an appeal from a jury verdict in favor of Berkshire Medical Center, Inc. ("Berkshire"), against its former general contractor, U.W. Marx, Inc. ("Marx"), over problems in the renovation and expansion of Berkshire's hospital facilities in Pittsfield, Massachusetts.

What happened is largely but not entirely undisputed.  In 2002, Berkshire began a significant overhaul of its facility.  The project aimed to renovate 70,000 square feet of existing hospital space and construct 40,000 square feet of new space, including an entirely new set of eight surgical operating rooms.  The surgical suite accounted for approximately 8,000 square feet of the new construction.

Berkshire engaged Marx, a New York based construction company, as the general contractor for the entire project.  Berkshire also hired Bovis Land Lease ("Bovis") to serve as its expert manager for the construction and Cannon Design to serve as its architect.  Berkshire and Marx signed a comprehensive contract (the "Trade Contractor Agreement") that set forth, among other things, Marx's warranty obligation.  In substance, Marx promised to repair--at no cost to Berkshire--any defects due to faulty workmanship or materials that appeared within one year of the completion of the work.

As general contractor, Marx was responsible for the flooring installed throughout the project.  In the operating rooms,

the flooring was to consist of vinyl tiles on top of concrete slabs. Marx laid the concrete slabs, but it subcontracted with a commercial flooring contractor, Rochester Flooring Resource ("Rochester"), to install the vinyl tiles. Prior to installing the vinyl in the operating rooms, Rochester advised Marx that the base layer of concrete had noticeable waves.

A finished floor product like vinyl should be directly glued to the base layer of concrete only when the surface of the concrete is smooth and level; vinyl installed on an uneven or wavy surface will itself be visibly uneven and, under heavy wear, may come loose from the concrete. After Rochester's warning, Marx undertook to smooth the concrete surface by applying "flash patch"--a cement-like powder mixed with water or another additive--to fill in the imperfections.

Applying flash patch is a standard fix, and the resulting intermediate layer between the concrete and finished floor is commonly called an "underlayment." Rochester remained concerned about installing the vinyl tiles in the operating rooms--even after Marx attempted the flash patch fix--and went so far as to request a release of liability from Marx. A less formal understanding was worked about between the two contractors.

Berkshire noticed problems with the floor in the new operating rooms as early as December 2003, even before the rooms were occupied. The hospital was especially concerned about

-3-

ruptures in the seams between vinyl tiles--which could harbor dangerous bacteria--and with the numerous air bubbles that had formed underneath the vinyl tiles--which could themselves rupture, creating more cracks for bacteria and a tripping hazard for hospital personnel working in surgical suites.

Marx apparently addressed these pre-occupancy problems with individual repairs, and Berkshire's architect certified in January 2004 that the construction of the new operating rooms was substantially complete--triggering the start of Marx's warranty period. Berkshire took control of the operating rooms that same month. Contemporaneous records show some flooring issues in the rooms at the time but no waves or bubbles.

However, new bubbles and split seams appeared in the operating rooms' flooring within the first three months of Berkshire's occupancy. Berkshire informed Marx of the problems, and Marx paid Rochester to fix them. One Berkshire representative estimated that more than fifty bubbles appeared at some point after the January 2004 turn-over; that some were quite substantial, including one four or five feet long; and that Marx had to send workers to fix the floors more than ten times. But Marx and Rochester never refused to address the problems.

In the repair process, the offending piece of vinyl would be cut out, the underlayment beneath it scraped up, new flash patch laid down, and new vinyl installed on top. Rochester's onsite

project manager, Thomas Urbano, noticed that the underlayment itself had crumbled into something resembling dust, which could cause the vinyl to come loose and form a bubble. In his experience, the crumbling could result from installing the vinyl flooring before the flash patch had properly dried out. Crumbling underlayment could also cause the seam to split between tiles.

Records from January 2005 show eighteen split seams and three bubbles in the floors of the operating rooms. The date is significant because Marx's one-year warranty expired that month. Other language in the warranty might have been read to extend it further, but Berkshire has not pressed that broader reading. By March 2005, all of the individual problems documented in January were apparently fixed by Marx and Rochester.

In Marx's view, this represented "satisfactory completion of all the outstanding flooring issues" covered by the warranty. Nevertheless, Marx and Rochester continued without charge to Berkshire to patch defects in the operating room floors--including new split seams and bubbling--as the problems persisted in 2005 and early 2006. Marx's principal, Peter Marx, claimed at trial that Marx performed these repairs (or, more precisely, paid Rochester to perform them) because it wanted to maintain its reputation for quality workmanship and thought it would be wrong "to run away from the problem."

Berkshire, however, was becoming increasingly concerned that the persistent flooring problem presented a serious threat to its operations. In June 2006, the hospital instructed its new director of facility management, Joseph LaRoche, to investigate the bubbles and split seams. After removing the offending vinyl, in several instances he discovered problems with the consistency of the underlayment--sometimes liquified and oozing rather than dry, sometimes broken up and chalky, sometimes stuck to the vinyl but not the concrete.

LaRoche's report convinced Berkshire to hire David Cowen, an architect employed by an expert-witness firm, to further investigate the flooring problems. Cowen confirmed that the operating room floors were beset with split seams and bubbles and recommended that the entire operating-suite floor be replaced. In the summer of 2006 Berkshire contacted vinyl flooring manufacturers and a contractor and, by the end of 2006, committed itself to replacing the floor, albeit without a conclusive explanation for the cause of the observed problems.

Just when Marx came to know that its further services would not be required is unclear. In late 2006, Bovis expressed concern that Berkshire aimed to replace the floor without Marx's involvement. John Rogers, general counsel to the hospital, replied that there was no other choice, given the failure of previous repair efforts and his concern that continued bubbles and split

seams in the operating room floors could imperil the hospital in upcoming accreditation inspections. By the end of December, Marx had been officially told.

Berkshire ultimately had the floor replaced by other companies at a cost of $398,070--a higher figure than the total amount Marx paid Rochester to install all the floors in the initial 110,000 square feet project. The steep price was largely due to need to construct and remove containment systems so the floors could be renovated one part at a time while medical procedures continued. After replacing the floors, Berkshire observed no split seams or bubbles in the operating rooms.

In May 2008, Berkshire brought the present lawsuit against Marx to recover the cost of replacing the operating room floors. The complaint, invoking diversity jurisdiction, included a claim for breach of the express warranty given in the Trade Contractor Agreement. By mutual consent, the case was tried before a magistrate judge. 28 U.S.C. § 636(c)(1) (2006). The jury awarded Berkshire $331,835 in damages on the express warranty count, and the district court entered judgment in that amount, plus prejudgment interest.[1]

---

[1]Although there were four other counts, two were dismissed by the court on the eve of trial and the other two were rejected by the jury. Marx had attempted to implead Rochester but was held barred by a forum-selection clause in Rochester's contract with Marx.

Marx now appeals, having preserved various claims by moving for judgment as a matter of law at trial and again after the verdict. Its appeal covers multiple topics: the one-year time limit on the warranty; the warranty's requirement of written notice to the contractor and an opportunity to cure the problem; an alleged failure of Berkshire to show that the incident was caused by faulty workmanship or material; and the amount of damages. The terms of the agreement frame these arguments and are central to the first two.

The agreement, so far as it bears on this appeal, has a bit of the chaotic character of insurance policies, with overlapping and sometimes redundant provisions in different places, including a cross-reference in the main document--the Trade Contractor Agreement--to a separate statement of "General Conditions" for the entire project. However, the pertinent conditions are consistent with the main warranty set forth in article 7.1 of the Trade Contractor Agreement, which provides that:

> The Trade Contractor [i.e., Marx] agrees to promptly make good, without cost to the Owner [i.e., Berkshire] or Architect, any and all defects, due to faulty workmanship and/or materials, which may appear within the guarantee or warranty period so established in the Contract Documents. If no such period be stipulated in the Contract Documents, then such guarantees shall be for a period of one (1) year from the date of (a) the date of completion and acceptance of work by the Owner, or (b) the date upon which the defect was, or with reasonable due diligence could have been, discovered by the Owner.

A subparagraph beneath this language provides that Marx will make warranty repairs "promptly after receipt of a written notice from the Owner to do so," which the owner shall give "promptly after discovery of the defective work or condition."

Deferring two final issues (fault and damages), Marx's main objections are that the floor replacement remedied problems that developed after the one-year period and, to the extent later bubbles or seam separations were within the warranty, the warranty required that Marx be given the opportunity itself to do the repair work--as it had previously done without complaint. Marx also complains that it had no "written notice" as called for in the Trade Contractor Agreement.

The three concerns all relate to a common question, namely, whether the bubbles and splits should be viewed as separate events or as a single episode. Although contract interpretation is a matter for the court, e.g., Lumber Mut. Ins. Co. v. Zoltek Corp., 647 N.E.2d 395, 396 (Mass. 1995), the agreement here--unlike some insurance policies--makes no effort to address the definitional question explicitly, and both the judge and the jury have something separate to contribute to answering it. As to legal rulings or instructions, our review is de novo; as to the jury, the more deferential standards associated with fact-finding are applied.

Juries commonly engage both in finding raw "what happened" facts and in applying general rubrics or standards to

those facts--the classic example is negligence--which in some sense is law-making in miniature. Restatement (Second) of Torts § 328C cmt. b (1965). Where the verdict does not allow the reviewing court to distinguish, the jury is taken to have found disputed facts favorable to the verdict and the court asks whether a reasonable jury could have so found. E.g., Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 207-08 (1st Cir. 2006).

In this case, the trial judge's instructions effectively allowed the jury to conclude, if the facts so warranted, that the splits and bubbles, whether they occurred before or after the end of the one-year period, were a manifestation of the same underlying problem. In closing, Berkshire's trial counsel used the term "systematic" (probably he meant "systemic"), and on appeal Berkshire likens the visible flaws to mere "symptoms" of a single "disease." Either way, a reading of the contract to permit the possibility of systemic failure makes good sense and is not inconsistent with the language of the warranty.

The bubbles and seam splits can be viewed, depending on diverse factors, either as individual "defects" (in the words of the agreement), or as that and also as manifestations of a larger "defect"--for example, deficient preparation of the underlayment so serious and widespread as to be more than an assortment of initial blemishes calling for individual repair. The considerations might

-10-

include the severity, scope, and persistence of the problems and the likelihood of a common source or set of sources.

Some cases will fall in the systemic or "symptoms of a disease" category and others will not; but where the former situation exists, the idea of a warranty would be undone if the manifestations occurring within the first year could be remedied but--the underlying cause left untreated--further manifestations would be the buyer's problem because they occurred sequentially rather than simultaneously. That the notion could be extended too far--Marx evokes a leaking roof twenty years after the initial job--just shows that there must be an outer limit.

Here, it was for the jury to find the facts and, also within reason, to apply the label, and we think that the jury could reasonably find that notice was given within one year of an underlying structural problem that Marx never resolved. Assuming this was a "defect" of faulty workmanship--we deal with this below--Marx was placed on notice of it once a succession of bubbles and splits appeared and was called to its attention even if neither side then fully understood the full scope of the problem.

No one disputes that notice of the initial problem was given to Marx and then acted upon, albeit (in hindsight) inadequately. How much of the notice was in writing is unclear but does not matter: any such failure was likely not a "material

breach,"[2] and, in any event, was "excused" when Marx accepted whatever notice was given and started to make the repairs.  See Restatement (Second) of Contracts, supra note 2, § 246(1).  Marx does not seriously press the issue of writing, relegating it to a footnote.

Marx's central complaint about notice is that it never got notice of a proposed replacement of the entire floor, nor was it given the opportunity to fix the floor itself.  Again, there is both a contract interpretation problem and, beyond that, a standards-application and fact-finding problem.  Both article 7.1 and cognate language elsewhere in the agreement make clear that the contractor is entitled to be told of and given a chance to remedy the defect by itself; nowhere does the agreement suggest that the contractor's obligation is to let the owner choose some other contractor to implement some other remedy.

But, while the contractor gets first crack, there has to be some end point.  If the contractor refused to do anything, the owner could do the job itself and sue for the cost; the result cannot be otherwise if, after repeated efforts over an extended period (here, between January 2004 and December 2006), the

_____

[2]A writing requirement avoids disputes about whether (and what) notice was given, e.g., Seaboard Sur. Co. v. Town of Greenfield ex rel. Greenfield Middle Sch. Bldg. Comm., 370 F.3d 215, 223 (1st Cir. 2004), but here notice even if oral was plainly given and acted upon.  See Restatement (Second) of Contracts §§ 237, 241 (1981) (materiality); cf. Taylor v. Int'l Indus., Inc., 398 N.E.2d 501, 502 (Mass. App. Ct. 1979).

-12-

contractor has attempted to provide a fix and failed to do so.[3] Whether it was unreasonable of Berkshire not to wait longer or offer Marx a chance to replace the entire floor are the kind of issues properly left to the jury.

We think a reasonable jury could find, even if not compelled to do so, that Berkshire properly invoked the warranty. Two years and a number of spot repair efforts by Marx had not led to any solution; a hospital can hardly be expected to tolerate indefinitely unsafe conditions; and Thomas Urbano--of Rochester, not Berkshire--had earlier told Marx's on-site representative that the failings of the underlayment in the operating rooms were systemic and that they ought to be addressed by replacing the floors rather than continuing with isolated fixes.[4]

As for giving Marx the option of doing the replacement job itself, Berkshire had little reason to think that Marx either could be trusted to do it or would have any interest in doing so. Replacing the entire floor in phases, while the hospital continued

---

[3]This is implicit, although not developed in detail, in a number of cases. E.g., Int'l Prod. Specialists, Inc. v. Schwing Am., Inc., 580 F.3d 587, 600-01 (7th Cir. 2009); Pennington v. Rhodes, 929 S.W.2d 169, 171, 172-73 (Ark. Ct. App. 1996); Hebert v. McDaniel, 479 So. 2d 1029, 1031-32, 1034-35 (La. Ct. App. 1985).

[4]Nothing like this occurred in the two cases on which Marx primarily relies: Weyerhaeuser Corp. v. D.C. Taylor Co., No. C02-141-LRR, 2005 WL 1800083 (N.D. Iowa July 29, 2005), and Chrysler Realty Co. v. Design Forum Architects, Inc., 544 F. Supp. 2d 609 (E.D. Mich. 2008), aff'd in part, rev'd in part, 341 F. App'x 93 (6th Cir. 2009).

to perform surgeries in less blemished segments of the suite, was obviously a drastic and very expensive proposition. Marx never volunteered to do it and even now does not suggest that it would have done so if asked.

The last major issue on appeal is whether the jury could conclude, without expert testimony, that the splits and bubbles were "due to faulty workmanship and/or materials" for which Marx was responsible under the warranty. Marx does not deny responsibility for the concrete and the underlayment that was applied; Rochester laid the tile but Marx was responsible for its subcontractors' work. And there was evidence in the record to suggest that the most likely of possible causes had to do with putting tile on wave-ridden concrete whose underlayment had not fully dried.

Although factual testimony from Urbano, LaRoche, and Cowen pointed in this direction, LaRoche's attempt to state his opinion was defeated when Marx objected to lack of expertise. Cowen's similar attempt was excluded in limine as unreliable under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Urbano testified only that the problems could be caused by improper installation of the underlayment.

But even if the jury lacked evidence sufficient to assign a precise cause, it could rely on its common sense to conclude that

-14-

a newly laid vinyl floor that immediately began to bubble and split was the product of faulty workmanship and/or materials supplied by those who prepared the surface or laid the tile. See Nemet v. Bos. Water & Sewer Comm'n, 775 N.E.2d 750, 755 (Mass. App. Ct. 2002). Res ipsa loquitur, applied in negligence cases, reflects the same idea. E.g., Gelinas v. New Eng. Power Co., 268 N.E.2d 336, 339 (Mass. 1971).

This is not because no other explanation can be imagined. In another case, the cause might be unreasonably rough use after the turn-over to the owner; but here the problems began before the turn-over and Marx never offered an explanation to rebut the obvious inference of faulty workmanship or material. As with res ipsa, an inference can be compelling enough--and was so here--to impose liability without knowing the precise cause or negating every other non-inculpatory possibility.

Finally, Marx argues that the measure of damages--the cost to replace the operating room floors--was disproportionate to the diminution in value suffered by Berkshire and was "wildly out of line with what should have been considered reasonable." Marx paid Rochester $377,317 to install flooring throughout the 110,000 square feet of the project; Berkshire sought to recover $398,070 for replacing the 8,000 square feet of operating room flooring; and the jury awarded $331,835.

-15-

The "all flooring" figure was for Rochester's part in laying down whatever surface was specified on a prepared base; the damages awarded by the jury were for replacement of what the evidence permitted it to conclude was a faulty base, further complicated by the need to complete the entire job in phases while operations were continuing. So Marx's raw numbers do not show that the repair work was over-priced and Marx offers nothing more.

Marx's argument on damages occupies two paragraphs and it is something of a throw-away at the end of the brief. Some arguments are so powerful that nothing more is needed, but this is hardly of that character. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990). The defects in the comparison are obvious; Marx points to no evidence that it was unreasonable for Berkshire to proceed in stages or that the repairs went beyond what was necessary.

Although "the market price of completing or correcting the performance" is a standard remedy in warranty cases, 24 R. Lord, Williston on Contracts § 66:17 (4th ed. 2002), courts sometimes disallow it where the cost will exceed the increased value of the property.[5] But the extra cost incurred in this case

---

[5]Restatement (Second) of Contracts, supra note 2, § 348(2) & cmt. c; see, e.g., Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109, 111-14 (Okla. 1962) (cost of remedying fault exceeded difference in market value), cert. denied, 375 U.S. 906 (1963); Jacob & Youngs, Inc. v. Kent, 129 N.E. 889, 890-91 (N.Y. 1921) (same).

to permit surgery to continue can be better justified, and Marx's counsel--who ably pressed several other serious arguments on appeal--reasonably omitted any attack along these lines.

Affirmed.