Jerry PENNINGTON d/b/a K & K Construction Company *v.* Walter D. RHODES and Georgetta B. Rhodes, His Wife

CA 95-847                                                                929 S.W.2d 169

Court of Appeals of Arkansas
Division II
Opinion delivered September 25, 1996
[Petition for rehearing denied November 6, 1996.]

*Brockman, Norton & Taylor,* by: *C. Mac Norton,* for appellant.

*Maxie G. Kizer, P.A.,* for appellees.

WENDELL L. GRIFFEN, Judge. Appellees Walter D. Rhodes and Georgetta B. Rhodes, his wife, sued Jerry Pennington d/b/a K & K Construction Company ("Pennington" or "appellant") for breach of contract in the Circuit Court of Jefferson County. Their complaint alleged that Pennington contracted with them to build a house during the summer of 1988, and that Pennington built the house and was paid $68,541.40 in October 1988. The complaint also alleged that appellees later discovered defective workmanship and materials that caused structural damage to the foundation, ma-

sonry, walls, framing, roof, and floor joists of the house, for which appellees sought judgment for damages totaling $150,000. Pennington admitted contracting with appellees, building their house, and being paid $68,541.40, but denied breaching their contract and asserted that he was not notified about alleged defects in materials and workmanship so that he could cure them if they existed.

The case was tried to a jury over two days, and the jury returned a verdict awarding damages to appellees of $68,541.40, the precise amount they paid Pennington. Pennington filed a motion for judgment notwithstanding the verdict, and, in the alternative, for new trial, but his motion was denied. Judgment was, therefore, entered against him for $68,541.40, plus costs of $109.75, and attorney fees of $6854.14, from which Pennington has brought this appeal. He contends that the trial court erred in denying his motion for directed verdict at the end of appellees' case, erred in denying his post-trial motion for judgment notwithstanding the verdict or for new trial because the jury verdict is not supported by the evidence, and also that the trial court should have sustained his motion for mistrial based upon the closing argument by counsel for appellees. We hold that the verdict was not supported by the evidence. Therefore, we reverse and remand for new trial.

## PENNINGTON'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

Rule 50(a) of the Arkansas Rules of Civil Procedure provides:

[a] party may move for a directed verdict at the close of the evidence offered by an opponent and may offer evidence in the event that the motion is not granted, without having reserved the right to do so and to the extent as if the motion had not been made. A party may also move for a directed verdict at the close of all of the evidence.

Rule 50(b) provides:

[w]henever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not more than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon

set aside and to have judgment entered in accordance with his motion for a directed verdict; or, if a verdict was not returned, that party may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned, the court may direct the entry of judgment as if the requested verdict had been directed, or it may order a new trial.

■ The intent of Rule 50(a) is to require a party testing the sufficiency of the evidence to first submit the question to the trial court, thereby permitting that court to rule at the conclusion of all the evidence but prior to verdict, and thus preserving the specific question for appeal. *Willson Safety Products* v. *Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729 (1990). On the other hand, the motion for judgment n.o.v. is permitted by Rule 50(b) for the express purpose of not only again raising the question of sufficiency of the evidence but also all other questions properly preserved during trial, all of which are to be considered by the court in light of the verdict rendered. *Id.* The motion for a directed verdict is a condition precedent to moving for a judgment notwithstanding the verdict based on the reasoning that a motion for judgment notwithstanding the verdict is technically only a renewal of the motion for directed verdict made at the close of the evidence. *Wheeler Motor Co., Inc.* v. *Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993).

■ Appellate review of a motion for a directed verdict entails determining whether the nonmovant's proof was so insubstantial as to require a jury verdict, if entered in his behalf, to be set aside. *Nicholson* v. *Simmons First Nat'l Corp.*, 312 Ark. 291, 849 S.W.2d 483 (1993). The standard of review in determining the propriety of refusing a directed-verdict motion is whether the verdict of the jury is supported by substantial evidence, that is, evidence that is sufficient to compel a conclusion one way or the other and that goes beyond suspicion or conjecture. *Barnes, Quinn, Flake & Anderson, Inc.* v. *Rankins*, 312 Ark. 240, 848 S.W.2d 924 (1993).

Pennington appears to concede that the appellees presented enough evidence to justify denial of his motion for directed verdict

as to breach of contract, and the record contains considerable evidence that the house Pennington constructed was defective. Appellee Georgetta Rhodes and seven other witnesses testified about defects in the house. The sheetrock was cracked despite Pennington's effort to repair it after appellees informed him about that problem. Although the house is totally electric and the Description of Materials provided that it would have a 200 ampere breaker, it was constructed with a 150 ampere breaker which could cause problems with inadequate voltage, according to one expert witness. Although the Description of Materials called for nine and one-fourth inches of insulation to be provided at the ceiling, witnesses testified that less than six inches was found. Two architects, a civil engineer, a retired housing inspector and electrician, and two building contractors testified concerning defects in the roof, walls, brick veneer, and foundation of the house. Although Pennington did not concede that the house was defective, the record contains no proof that these defects were not present.

■ However, Pennington argues that he was entitled to a directed verdict because he was not given notice of the defects and a reasonable opportunity to correct them before suit was filed. In *Pickler* v. *Fisher*, 7 Ark. App. 125, 644 S.W.2d 644 (1983), we rejected the notion that one who purchases what is alleged to be a defective new dwelling must give notice to the seller-builder of each and every defect complained of and that upon failure to do so will have waived any defects not contained in a written notice. While we declined to hold the provisions of the Uniform Commercial Code applicable to all cases involving breach of warranty in new housing, we stated that the buyer is not required to list each and every objection that he would rely on to constitute the breach. Instead, we held that notification need only be with sufficient clarity to apprise the vendor-builder that a breach of implied warranty is being asserted and to give him sufficient opportunity to inspect the premises and correct the defects. *Id*. The sufficiency of the notice and whether it was given within a reasonable time are ordinarily questions of fact for the trier of fact to determine, and we observed that in doing so the trier of fact could properly consider the superior position of the builder in determining the extent of a defect, the need for correcting it, and the consequences for failing to do so. *Id*., 7 Ark. App. at 129, 644 S.W.2d at 646.

■ There was evidence in the case now before us that Pen-

nington was notified at least three times about problems with the house. He attempted to repair some of the problems, but apparently urged the appellees to let some of the observable cracks in walls "run their course." Later investigation by others revealed serious structural defects with the house, as already mentioned. Suffice it to say that the record contains ample proof to support the apparent conclusion by the jury that the house was defective and that Pennington knew about the defects so that he could have undertaken corrections had he been inclined to do so. Therefore, the trial court properly denied his motion for directed verdict on the notice issue.

Pennington also moved for directed verdict at the close of appellees' case on the ground that appellees failed to present proof concerning the value of the defective house. There was proof from three witnesses concerning the estimated cost of repairing the defects. William W. Hope, a civil engineer, testified that it would cost at least $58,000 to repair the foundation, replace and repair defects in brick veneer, walls and floors, repair the roof framing, and provide oversight and design for the work, and that although the house could be repaired the cost could exceed the $58,000 estimate. James L. Scott, a retired builder, testified that the cost to repair the house would be $41,750, but that he did not believe that the house could be repaired and that there would be "significant waste of materials" in trying to repair it. Scott testified that he would not attempt to repair the house, but that he would advise the owners to level it and rebuild. Michael James Ott, a homebuilder and repair and remodeling contractor, estimated that the cost to repair the house with its defects would be $43,540, and he believed that the house could be repaired. However, he emphasized that his estimate did not include foundation repairs which, in his view, would cost more than the total estimated for the remaining work. None of these witnesses was asked to estimate the value of the house with its defects, only the cost of repairing the defects.

■ In cases involving breach of warranty for a newly constructed house, Arkansas has recognized two ways of proving damages. The preferred measure of damages in construction contract cases involving new structures is to use the cost of repairing the defects so that the vendee-owner recovers an amount that will repair the house to the quality expected when the parties struck their bargain. *Daniel v. Quick*, 270 Ark. 528, 606 S.W.2d 81 (1980). The other method is to fix damages as the difference in the house's

value as defective versus its value without defects. *See Carter* v. *Quick*, 263 Ark. 202, 563 S.W.2d 461 (1978). In *Williams* v. *Charles Sloan, Inc.*, 17 Ark. App. 247, 706 S.W.2d 405 (1986), we reversed a judgment based on a jury verdict of $28,000 in favor of purchasers of a defective house because the verdict was not supported by the evidence based on the difference in value measure of damages, and we cited the two methods of determining damages where breach of a construction contract results in incomplete or defective construction. The Restatement (Second) of Contracts, § 348(2) (1979) defines these methods as follows:

§ 348. Alternatives to Loss in Value of Performance

. . . .

(2) If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on

(a) the diminution in the market price of the property caused by the breach, or

(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

Comment c to Section 348 speaks to the incomplete or defective performance situation, and is instructive concerning when the cost-of-repairs standard may be preferred over the diminution-in-value standard:

Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with reasonable certainty. In that case he can usually recover damages based on the cost to remedy the defects. Even if this gives him a recovery somewhat in excess of the loss in value to him, it is better that he receive a small windfall than that he be under-compensated by being limited to the resulting diminution in the market value of his property.

Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value

to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him. If an award based on the cost to remedy the defects would clearly be excessive and the injured party does not prove the actual loss in value to him, damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects. This diminution in market price is the least possible loss in value to the injured party, since he could always sell the property on the market even if it had no special value to him.

Restatement (Second) of Contracts § 348 cmt. c (1979).

■■ Although the Restatement approach to determining if the repair costs are disproportionate looks to the probable loss of value caused by the defective construction, Arkansas looks to whether the repair costs are disproportionate to the results to be obtained from curing the defects where the building is a dwelling built on the owner's property for his occupancy. *Carter v. Quick*, 263 Ark. 202, 563 S.W.2d 461 (1978). In that case the Supreme Court addressed the proper measure of damages applicable in cases involving a suit by a vendee-owner against a vendor-builder alleging defective construction of a new house, and observed that the underlying purpose in awarding damages for breach of contract is to place the injured party in as good a position as he would have been had the contract been performed. *Id.* (citing *Rebsamen Companies, Inc. v. Arkansas St. Hosp.*, 258 Ark. 160, 522 S.W.2d 845 (1975)). However, the Court also observed that the difference in the value of a building as erected and its value if it had been constructed according to the contract is not always appropriate where the contractor's performance is defective, particularly where a house is built on the owner's property for his own occupancy and the aesthetic value of enjoying a properly constructed home is involved. *Carter, supra.*

We stated in *Williams* that although judicial preference for the cost-of-repairs measure and the economic-waste exception is an effort to avoid the situation where the contractor is required to tear down a structure or otherwise commit economic waste to correct a defect that does not detract from the market value as much as it would cost to repair it, this preference for the cost-of-repair measure and the economic-waste exception does not limit the injured buyer to only one measure of damages. 17 Ark. App. at 251, 706 S.W.2d at 407. Writing for the court in *Williams*, then Judge (now Justice) Corbin stated that "the court would be correct in applying the cost of repairs measure to determine the damages where the injured buyer asserts damages based on the difference in market value *and the contractor presents evidence that the cost of repairing the defects would be less than the difference in market value.*" *Id.* (Emphasis added.) We ultimately held that the $28,000 verdict for the homeowner in *Williams* was not supported by substantial evidence because the evidence in that case only supported a verdict of $6,500 based on the difference between the market value of the house as defective at the time of the breach, and its value had it been constructed in accordance with the contract. However, we rejected the builders' contention that they were entitled to a judgment notwithstanding the verdict because the trial court had used an improper measure of damages (difference in market value) where the builders presented no evidence that cost of repairs was the correct measure of damages.

The same reasoning applies in this case, although we are presented with the opposite situation. Here, the buyers presented proof concerning the cost of repairs but no proof on the difference in market value of their house. As the *Williams* opinion indicated, preference for the cost-of-repairs measure and the economic-waste exception does not limit the injured buyer to only one measure of damages. If Pennington believed that cost of repairs was not the correct measure of damages, he had an opportunity to present evidence on the difference in market value caused by the defects. The mere fact that appellees presented no proof on the difference in market value did not mean that the jury was forced to conjecture or surmise before it could return a verdict on the cost-of-repairs measure of damages.

However, once appellees presented sufficient proof to go to the jury on the cost-of-repairs measure, the burden shifted to

Pennington to produce evidence showing either (a) that repairing the defects was unreasonable because it would have involved more destruction of quality workmanship than would have been warranted considering the value likely to be added to the house by making the repairs, or (b) that the repair costs would have been disproportionate to the probable increase in value to appellees resulting from proper construction, so that difference in value would have been the proper measure of damages. Either approach would have required proof regarding the value of the house as defectively constructed and its value if constructed without defect as the contract contemplated. Pennington clearly did not produce that proof, either when appellees rested their case or at the close of all the proof, so the trial court properly denied his motion for directed verdict.

It is true that appellees presented proof from a real-estate appraiser showing the value of the house to be $87,000 without defects. It is also true that appellees paid $68,541.40 to Pennington under their contract. Nevertheless, the contract price certainly should not be deemed the value that the parties agreed the house would have due to the defective construction. There was no proof regarding the value of the house as defectively constructed. The evidence was conflicting on whether the house could be repaired, or whether repairing it was economically feasible, thus presenting a question of fact for the jury to resolve. Before the cost-of-repairs measure of damages could be deemed improper on the ground that the cost of repairs was disproportionate to the probable value that might be gained from making them, Pennington was obligated to either prove that it would have been unreasonable to repair the defects because doing so would have necessitated the loss of quality construction greatly exceeding whatever benefit that might have been added to the house by the repairs, or prove that the repair costs were disproportionate to the value that would have been added to the house by making the repairs. Either approach required proof of what the house is worth in its defective state. Pennington's failure to present that proof justified denial of his motion for directed verdict and his motion for judgment n.o.v. based on the measure-of-damages argument.

In summary, the general rule preferred in Arkansas in cases involving defective performance of a contract for a newly constructed house is that the cost of correcting the defects, rather

than the difference in value, is the proper measure of damages where the repairs will not involve unreasonable destruction of quality construction, or the repair cost will not be grossly disproportionate to the benefit to be obtained from making the repairs. This standard applies even when the value of a newly constructed but defective house exceeds the contract price, because the owner's interest "is in having defective construction corrected so that he and his family may enjoy a properly constructed dwelling and he is not concerned with offsetting any loss on a possible resale of the property. In such a case, aesthetic values are properly involved." *Carter* v. *Quick*, 263 Ark. at 209; 563 S.W.2d at 465. Nevertheless, the buyer-owner is not limited to the cost-of-repairs measure of damages. *Williams, supra.* The seller-builder of the defective new dwelling has the burden of proving that the cost-of-repairs standard is improper. This proof may take the form of evidence showing that repairing the defects will involve unreasonable destruction of quality construction or that the cost of repairs would be grossly disproportionate to the increase in value to be obtained from making them. If the seller-builder fails to present that proof, as in this case, he is not entitled to a directed verdict or judgment notwithstanding the verdict where the owner has introduced proof showing the cost of repairs.

## PENNINGTON'S MOTION FOR NEW TRIAL

Pennington also contends that the trial court erred by denying his motion for new trial pursuant to ARCP 59, arguing that the verdict is clearly contrary to the preponderance of the evidence and clearly contrary to law. We agree that the verdict is not supported by the evidence.

The jury returned a verdict for appellees of $68,541.60, the precise amount that appellees paid Pennington under their contract. There was no proof that this amount equaled the cost of repairing the defects to the house. There was no proof that the house was worthless; indeed, appellees introduced proof through witness Hope, the civil engineer, that the house was worth repairing even if the cost of repairs equaled or exceeded $58,000. Although another witness testified that he did not believe that the house could be repaired and would not counsel trying to repair it, that testimony did not mean that the house was worthless, rather that the witness did not believe that the defects could be repaired.

■ The jury was apparently persuaded to return a verdict awarding the appellees the amount they paid Pennington based on the closing argument by counsel for appellees. During that argument, counsel for appellees told the jury that it could return a verdict awarding the money that appellees had paid. Counsel for Pennington objected. The trial court overruled the objection on the ground that arguments of counsel are not evidence. We decline to disturb that ruling out of deference to the exercise of the trial judge's discretion, and find no abuse of discretion in the ruling. *See also Fraught v. Ligon Specialized Hauler, Inc.*, 273 Ark. 259, 619 S.W.2d 627 (1981).

■ We are constrained, however, to hold that the verdict is not supported by the evidence where it did not conform to any of the cost-of-repairs proof and the record contains no proof about the value of the house as defectively constructed. In effect, the jury awarded the appellees the same relief that they might have obtained upon a complaint for rescission of the contract and restitution. The fundamental difference, however, is that while return of the purchase price is permissible in an action for rescission on the theory that the fundamental purpose of the contract has failed resulting in the complaining party receiving *no benefit* from its bargain, an action for breach of contract implies that the complaining party received *less benefit* than it had a right to expect because of the other party's breach. In this case, appellees proved that they paid $68,541.40, and that Pennington built a house that was defective. They sued contending that Pennington had built a defective house, not that the house is worthless. Therefore, the jury verdict awarding them their purchase price is not supported by the evidence and must be reversed.

■ The appellees produced evidence through one witness that it would cost at least $58,000 to repair the defects. Pursuant to our decision in *Williams v. Charles Sloan, Inc., supra.* we reverse the judgment below and remand to the trial judge with an instruction that the verdict be reduced to $58,000 to conform to the evidence, if appellees agree. If appellees do not agree to the remittitur, the trial judge should enter an order granting Pennington's motion for new trial.

Reversed and remanded.

ROBBINS and STROUD, JJ., agree.