CINNAMON VALLEY RESORT, James Walsh and
Carolyn Walsh  *v.*  EMAC ENTERPRISES, INC.

CA 03-1112                                    202 S.W.3d 8

Court of Appeals of Arkansas
Opinion delivered February 2, 2005

[Rehearing denied March 9, 2005.]

*Parker Law Firm*, by: *Tim S. Parker*, for appellants.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *George R. Rhoads*, for appellee.

JOHN MAUZY PITTMAN, Chief Judge. Appellants Cinnamon Valley Resort and its owners, James and Carolyn Walsh (hereafter to be referred to collectively as "the Resort"), were sued by appellee EMAC Enterprises to recover money due and owing on a construction contract. The Resort counterclaimed for breach of contract and breach of warranty, seeking lost revenue and repair expenses it incurred as a result of EMAC's construction delays and faulty workmanship. The case was tried to a jury, which awarded EMAC $40,444.68 on its complaint and awarded the Resort nothing on its counterclaim.

The Resort now appeals and argues that the trial court erred in: 1) instructing the jury on the breach-of-warranty claim with a modified version of AMI Civil 3507; 2) directing a verdict against the Resort on its claim for lost revenue; 3) denying the Resort's motion for a directed verdict against EMAC; 4) refusing to instruct the jury that EMAC was not entitled to a commission on costs that exceeded its estimate. We affirm the jury's verdict in all respects.

The Cinnamon Valley Resort is located in Eureka Springs and consists of nine luxury log cabins. In November 1999, when there were only seven cabins at the Resort, appellant James Walsh contacted EMAC about building two new rental cabins. The cabins are referred to by the parties as the Blue Heron and Fannie's Barn, and we will do likewise in this opinion. EMAC's president,

Edward McClung, prepared a rough, dry-in[1] estimate of $61,471 for the Blue Heron. No such estimate appears in the record for Fannie's Barn.

In early 2000, McClung and Walsh met and decided where the two new cabins would be built. At that time, they agreed that EMAC would work on a cost-plus basis for a fee of 12.5% over and above the cost of the two cabins. They also agreed, at a later time, that EMAC would make repairs to other cabins and would build a spillway over a lake on the property. It is undisputed that the parties never entered into a written contract. However, according to James Walsh, he sent EMAC a "Memorandum of Understanding" within a week of the meeting confirming, *inter alia*, that 1) the cabins would be constructed on a cost-plus basis with EMAC marking up construction materials and subcontracts 12.5%; 2) labor rates would be $20 per hour for carpenters and $14 per hour for helpers; 3) the scheduled completion date for the Blue Heron would be four months from the date of the delivery of logs; 4) the scheduled completion date for Fannie's Barn would be six months from the date of the delivery of logs. McClung denied ever receiving the Memorandum of Understanding and testified that he never guaranteed a completion date.

Logs were delivered for the Blue Heron in April 2000 and for Fannie's Barn in August 2000. EMAC began work on the Blue Heron within a few days of the log delivery and, when that structure was about 70% complete, began work on Fannie's Barn. James Walsh testified that he had slight misgivings about EMAC's work almost immediately due to the small size of EMAC's crew. Nevertheless, from May 2000 to September 2000, the Resort made several payments to EMAC in the total amount of approximately $114,000. In approximately September 2000, when both cabins still were not completed, Walsh told McClung that he was unhappy with the progress of the construction. McClung, who would later testify that Mrs. Walsh made numerous changes and suggestions that extended construction time, suggested that the Resort hire another contractor to complete the job, which the Resort did in October 2000. According to McClung and his foreman, Charles Segi, at the time EMAC left the project, it had

---

[1] "Dry-in" was explained at trial to mean walls up; the roof on and covered; and the exterior doors and windows set.

basically completed the spillway, was at the "punch list" stage on the Blue Heron, and had completed the floor system, walls, and roof of Fannie's Barn.

After leaving the job, EMAC submitted six final invoices to the Resort. The invoices totaled $83,924.69 and included charges for supplies, subcontractors, labor, and the 12.5% contractor's fee. Later at trial, McClung and Walsh testified that, after receiving the invoices, the Resort made approximately $43,000 worth of payments directly to subcontractors and suppliers. EMAC therefore allowed a credit for those payments, leaving a balance due of $40,444.68. McClung asked the jury to award EMAC that amount.

The Resort, as proof of its counterclaim, presented the testimony of substitute contractor Bruce Foster, who worked on the Blue Heron and Fannie's Barn from October 2000 through October 2001. Foster testified that the Blue Heron was "fine," although he performed approximately $803.16 worth of repairs on it. However, he said that Fannie's Barn had numerous construction defects that required him to perform $13,323 in repairs. The Resort also presented evidence that the Blue Heron and Fannie's Barn were not ready for occupancy until approximately six to seven months beyond what the Resort considered to be their scheduled completion dates. Further, James and Carolyn Walsh testified that the cabins rented for $225 per night and that the Resort traditionally enjoyed an 80% occupancy rate. At the close of the Resort's evidence, the trial judge directed a verdict against the Resort on its lost revenue claim. As a result, the only element of damage upon which the jury was instructed with regard to the counterclaim was the cost of correcting EMAC's work.

Following the trial, the jury found in favor of EMAC on its claim and awarded it $40,444.68 but found against the Resort on its counterclaim, awarding it nothing. The verdict was incorporated into a judgment, from which the Resort now appeals.

### Instructing The Jury With AMI 3507 As Modified

The Resort argues first that the trial court erred in instructing the jury with a modified version of Arkansas Model Jury Instruction–Civil 3507, which is designed for use in breach-of-warranty cases under the Uniform Commercial Code (UCC). The instruction given to the jury read as follows:

Cinnamon Valley Resort claims damages from EMAC Enterprises for breach of warranty, and has the burden of proving each of five essential propositions:

First, that Cinnamon Valley Resort has sustained damages. Second, that Cinnamon Valley resort and EMAC Enterprises entered into a contract. Third, that the work of EMAC Enterprises failed to conform to the warranty to perform its work in a good and workman-like manner. Fourth, that the failure of EMAC Enterprises to conform to the warranty to perform its work in a good and workman-like manner proximately caused Cinnamon Valley resort damages. And fifth, *that Cinnamon Valley Resort gave notice to EMAC Enterprises of its failure to conform to the warrant[y] to perform its work in a good and workman-like manner within a reasonable time.*

(Emphasis added.) The Resort contends that the instruction should not have been used in this non-UCC case and that, by virtue of the italicized portion, above, it incorrectly placed upon the Resort the burden of notifying EMAC of any defects in the work.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). We will not reverse a trial court's decision to give an instruction unless the court abused its discretion. *See Marx v. Huron Little Rock*, 88 Ark. App. 284, 198 S.W.3d 127 (2004).

We note at the outset that the Resort has changed its argument on appeal regarding this instruction. At the trial level, the Resort objected to the instruction because it told the jury that, in order for the Resort to prove a breach of warranty, the Resort must prove that it "did what the parties' contract required of it to claim the warranties." The Resort contended that such language, which derives from AMI 3507, imposed an obligation upon the Resort to pay EMAC before asserting a breach of warranty. The trial judge agreed to strike the language. The Resort thereafter asserted no further objection to the instruction other than "it's a UCC instruction." No objection was made on the ground that the instruction required the resort to give EMAC notice of defects.

We will not consider an argument raised for the first time on appeal, and a party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made at trial. *See Jacobs v. Yates*, 342 Ark.

243, 27 S.W.3d 734 (2000). Because the Resort did not object below to the instruction's language regarding notice of defects, it cannot argue on appeal that the inclusion of such language in the instruction merits reversal.

■ In any event, we conclude that the trial court did not abuse its discretion in giving the instruction. While the Resort correctly notes that it is generally in the UCC setting involving a sale of goods where the buyer, as a prerequisite to asserting an action for breach of warranty, must notify the seller of any defects in the goods and allow the seller an opportunity to cure, *see* Ark. Code Ann. § 4-2-607 (Repl. 2001), a breach of warranty may also arise in cases that do not involve a sale of goods under the UCC. For instance, a building contractor impliedly warrants that his work will be done in a good and workmanlike manner and will be reasonably fit for its intended purpose. *See Carroll-Boone Water Dist. v. M&P Equip. Co.*, 280 Ark. 560, 661 S.W.2d 345 (1983). The law also provides that a contractor who has built a new dwelling is entitled to at least some notice of defects in a breach-of-warranty action, despite the fact that the transaction is not governed by the UCC. *See Pennington v. Rhodes*, 55 Ark. App. 42, 929 S.W.2d 169 (1996); *Pickler v. Fisher*, 7 Ark. App. 125, 644 S.W.2d 644 (1983). In those cases, we held that, while the purchaser of a newly built dwelling is not required to list each and every defect of which he complains in order to preserve a breach-of-warranty claim, "notification need only be with sufficient clarity to apprise the vendor-builder that a breach of warranty is being asserted and to give him sufficient opportunity to inspect the premises and correct the defects." *See Pennington*, 55 Ark. App. at 49, 929 S.W.2d at 172-73; *Pickler*, 7 Ark. App. at 129, 644 S.W.2d at 646.

■ The Resort attempts to distinguish *Pennington* and *Pickler* from the case at bar because the defendants in those cases, unlike EMAC, were *vendor*-builders, thus implicating the UCC. However, in *Pennington* and *Pickler*, no such distinction was made, and we determined that, regardless of whether the UCC applied, some notice of breach of warranty was required by one asserting a claim of poor workmanship in the construction of a dwelling. As we stated in *Pickler*, "[w]hile we do not declare that the provisions of the Uniform Commercial Code govern all cases involving breach of warranty as to new housing, we do find that the standard set out there is a reasonable one for application to the case now

under review." 7 Ark. App. at 129, 644 S.W.2d at 646. Thus, the jury instruction based on AMI 3507 was not erroneously given.

■ We finally note that it is highly unlikely that the Resort was prejudiced by the instruction at issue. Even an erroneous instruction may be rendered harmless by other factors in the case. *Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996). Moreover, jury instructions should not be reviewed in isolation but rather considered as a whole in determining whether the applicable law has been given to the jury. *See id.* A separate instruction given to the jury in the case at bar stated, in pertinent part:

> Cinnamon Valley Resort was not required to list each and every objection that Cinnamon Valley Resort would rely on to constitute a breach of warranty, when notifying EMAC Enterprises of alleged defects in the construction. Instead, the notification only needed to be of sufficient clarity to apprise EMAC Enterprises of the alleged defects and problems being asserted, and to give EMAC Enterprises sufficient opportunity to inspect the premises and correct the alleged defects and problems. You are to determine if the notice was sufficient. . . .

As can be seen, the language in the above instruction mirrors the language in *Pennington* and *Pickler* regarding notice of defects. Further, the instruction was given without objection by the Resort, even though it contained the same alleged infirmity as the instruction now challenged on appeal, *i.e.*, a requirement that the Resort notify EMAC of defects. Thus, we cannot see how the Resort was prejudiced by the giving of the instruction based on AMI 3507.

### Grant of a Partial Directed Verdict Against The Resort

The Resort's next argument is that the trial court erred in granting a directed verdict against it on its claim for lost revenues. In reviewing a grant of a directed verdict, we view the evidence in the light most favorable to the party against whom the verdict was directed. *Trotter v. Bowden*, 81 Ark. App. 259, 101 S.W.3d 264 (2003). If any substantial evidence exists that tends to establish an issue in favor of that party, then a jury question is presented and the directed verdict should be reversed. *Id.*

During trial, the Resort offered evidence of the rental charges and historical occupancy rates of its cabins and alleged that EMAC was responsible for a six-to-seven month delay in com-

pleting the cabins. At the close of the Resort's evidence, EMAC moved for a directed verdict on the ground that the Resort had not shown "any type of tacit agreement that would entitle them to recover anything extra that would be in the . . . nature of the loss of rentals, that would justify any loss of rental income being offered."[2] The trial court, however, did not address that particular argument but instead granted a directed verdict on the ground that "[p]roving gross income alone is insufficient to prove lost profits." The Resort asserts that this ruling was in error.

■ Our courts have recognized that proof of a loss of gross revenues is not substantial evidence of lost profits. *See, e.g., Interstate Oil & Supply Co. v. Troutman Oil Co.*, 334 Ark. 1, 972 S.W.2d 941 (1998); *Ishie v. Kelley*, 302 Ark. 112, 788 S.W.2d 225 (1990); *Farmers Coop. Ass'n v. Phillips*, 241 Ark. 28, 405 S.W.2d 939 (1966). However, those cases are inapplicable to the case at bar because those plaintiffs sought profits they anticipated making under a contract with the breaching party. By contrast, in this case, the Resort was not seeking profits it hoped to make under a contract with EMAC but rather losses it sustained as a result of EMAC's alleged delay in completing the cabins. Under Arkansas law, when a contractor delays completion of a building, the proper measure of damages is the rental value of the building during the time that the owner is deprived of its use. *See Long v. Chas. T. Abeles & Co.*, 77 Ark. 150, 91 S.W. 29 (1905); *see also* Howard W. Brill, *Arkansas Law of Damages* § 17-3 (4th ed. 2002). The rental value of the cabins during the period of delay is precisely the type of evidence that the Resort offered in support of its counterclaim. The trial court's conclusion that the Resort failed to put on proof of its damages is therefore incorrect.

■ The question remains, however, whether the trial court's error was harmless in light of the jury's rejection of the Resort's counterclaim. In some instances, a trial court's error in granting a partial directed verdict may be cured by the jury's verdict. For example, in *Ewing v. Cargill*, 324 Ark. 217, 919 S.W.2d 507 (1996) (overruled on other grounds in *United Insurance Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998)), the jury

---

[2] This was apparently an argument that damages for lost rentals were not within the contemplation of the parties to the contract. *See generally* Howard W. Brill, *Arkansas Law of Damages* § 4-4 (4th ed. 2002).

found that the plaintiff had not been defamed; thus, the supreme court held that any error by the trial court in partially directing a verdict against the plaintiff for certain elements of damages was harmless. In the case at bar, the jury was instructed on the Resort's breach-of-contract and breach-of-warranty theories yet rendered a general verdict in favor of EMAC. It is therefore apparent that the jury found that EMAC neither breached its contract nor breached a warranty, whether by failing to timely complete the cabins or by any other means. That being the case, the Resort would not have recovered damages for its lost rentals even if no verdict had been directed against it. Consequently, any error in directing the verdict was rendered harmless by the jury's rejection of the counterclaim.[3]

### Denial of The Resort's Motion for a Directed Verdict Against EMAC

Next, the Resort argues that the trial court should have granted its motion for a directed verdict against EMAC. At the close of EMAC's case and at the close of all evidence, the Resort moved for a directed verdict on the grounds that 1) EMAC had not proved with certainty how much it paid its laborers, 2) EMAC made no deductions from its invoices for labor problems, and 3) McClung admitted in his deposition that he did not intend to charge the Resort a 12.5% commission on amounts that the Resort paid to suppliers and subcontractors. The resort now asserts these grounds, in an elaborated fashion, on appeal.

In reviewing a denial of a motion for a directed verdict, our task is to determine whether the jury's verdict is supported by substantial evidence. *Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 129 S.W.3d 324 (2003). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to

---

[3] We have considered the possibility of whether the jury, in rejecting the Resort's counterclaim, found that EMAC committed a breach but that the Resort failed to prove damages. The only damages that the jury was instructed to award on the counterclaim were for "the cost of correcting any defective work." The evidence that the Resort presented on that element of damage was such that it could hardly have been rejected, had a breach been found. The Resort presented the testimony of its substitute contractor Bruce Foster and a voluminous amount of documentary evidence regarding the cost of repairs, both virtually undisputed. Thus, we can readily conclude that the only logical basis for the jury's verdict was its determination that EMAC did not breach its contract or breach a warranty.

resort to speculation or conjecture. *Id.* When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

With these standards in mind, we first address the Resort's arguments that a directed verdict should have been granted against EMAC because EMAC did not produce evidence to show how much it paid its workers; did not produce evidence of how much it paid in payroll taxes or workers' compensation; did not document the hours worked by each carpenter and helper; and made no deductions for money paid to substandard workers. At trial, Edward McClung, on behalf of EMAC, offered six final invoices into evidence, five of which contained charges for labor. The invoices were supported by copies of bills from suppliers and subcontractors, but they did not contain a breakdown of labor charges by number of hours worked, nor did they indicate how many hours were attributable to carpenters (who were to be charged at $20 per hour) or to helpers (who were to be charged at $14 or $15 per hour). McClung testified that he did not send the Resort copies of workers' time sheets or paychecks on a regular basis but did send copies of all time cards once EMAC had left the project. He also testified that EMAC itself had paid the carpenters between $12 and $18 per hour and helpers between $10 and $11 per hour; he said that EMAC charged the Resort at a rate greater than what EMAC actually paid the workers in order to cover items such as payroll taxes and workers' compensation. Finally, he testified that, while he had made no deductions for wages he paid to workers who were not up to the job, the Resort "got something in return" for that work because the workers, while not as proficient as he had hoped, did work on the project.

■ The Resort does not explain to our satisfaction why the amount that EMAC paid its laborers or the amount that EMAC paid in labor-related expenses has any bearing on the amount the Resort owed on the building contract. Even James Walsh testified that EMAC and the Resort agreed that certain hourly rates would be charged for carpenters and helpers, and there was no testimony that those rates would vary or otherwise be affected by EMAC's underlying costs. As for the Resort's allegations that EMAC's invoices were inflated in some respect, whether by overcharges or by charging for substandard labor, those are allegations with which the Resort might have questioned the weight or credibility of EMAC's claim for damages; they did not

merit a directed verdict. The purpose of a directed-verdict motion is to determine whether the plaintiff has made a *prima facie* case. *See Wilson Safety Prods. v. Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729 (1990). EMAC did so here by offering into evidence copies of its invoices and the supporting testimony of Edward McClung. Having done so, the weight and value to be accorded that evidence was the exclusive province of the jury. *See Limited Stores, Inc. v. Wilson-Robinson*, 317 Ark. 80, 876 S.W.2d 248 (1994).

The same reasoning applies to the Resort's argument regarding EMAC's 12.5% commission. As mentioned earlier, after EMAC submitted its final invoices to the Resort, the Resort paid the subcontractors and suppliers directly. At trial, McClung testified that EMAC intended to collect its 12.5% commission on those amounts paid by the Resort. The Resort cross-examined McClung on the following deposition testimony, wherein he purportedly stated that he would not charge the Resort a commission on bills paid by the Resort:

> Q. If — instead of you paying the cost, Cinnamon Valley or the Walshes were paying the cost, were you trying to charge them 12 ½ percent of the money that they were putting up front that you didn't have to pay?
>
> R. No, I wasn't, but I should've.

The Resort characterizes the above testimony as a "pivotal admission" that EMAC would not collect a commission on amounts paid by the Resort. It cites several summary-judgment cases for the proposition that, when a plaintiff makes a pivotal admission in a deposition that goes to the heart of a matter in issue, he may not collaterally attack the substance of his admission. *See, e.g., Calcagno v. Shelter Mut. Ins. Co.*, 330 Ark. 802, 957 S.W.2d 700 (1997); *Sublett v. Hipps*, 330 Ark. 58, 952 S.W.2d 140 (1997). However, McClung's deposition testimony was not offered in support of a motion for summary judgment but as impeachment of his trial testimony. Thus, the jury had before it a credibility question, and it was the jury's prerogative to resolve it. *See generally Columbia Nat'l Ins. Co. v. Freeman*, 347 Ark. 423, 64 S.W.3d 720 (2002). Further, McClung's deposition testimony can hardly be characterized as an unequivocal admission. He explained at trial that he understood the deposition question to be whether EMAC intended to charge a commission on items that the Resort had on

hand at the beginning of the project or provided during the course of construction. There being a conflict on this point to be resolved by the jury, we affirm the trial court's denial of a directed verdict.

### Refusal of Proffered Instruction

The Resort proffered an instruction that read: "A contractor whose cost estimate is culpably below the actual cost is not entitled to a commission upon the excessive costs." The trial court refused to give the instruction, and the Resort now argues that this was error. Our standard of review is that a trial court's refusal to give a proffered jury instruction will not be reversed absent an abuse of discretion. *Barnes v. Everett, supra.*

█ The Resort's argument is based on its claim that the "actual labor costs on the Blue Heron were subsequently found to exceed [EMAC's] estimated costs by over one hundred percent." The Resort is referring to the fact that the final labor costs on the Blue Heron were almost $47,000, while the initial estimate of labor costs on the Blue Heron was $20,000. However, the $20,000 figure from the initial estimate was for the dry-in stage only. There is no evidence that EMAC gave any estimate on the final labor costs of the Blue Heron. That distinguishes this case from those cited by the Resort in which the initial estimate for the contractor's entire job was culpably below the actual cost of the job. *Clark v. Madeira*, 252 Ark. 157, 477 S.W.2d 817 (1972); *Vaccaro v. Smith*, 29 Ark. App. 175, 779 S.W.2d 193 (1989). We therefore find no abuse of discretion in refusing the proffered instruction.

For the reasons stated, we affirm the jury's verdict in this case.

Affirmed.

GLOVER and BAKER, JJ., agree.