Cite as 2025 Ark. App. 531

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-24-560

| | |
|---|---|
| DUSTIN KEATHLEY D/B/A DSR CONSTRUCTION AND PATSY KEATHLEY<br><br>APPELLANTS<br><br>V.<br><br>DEAN HALIJAN AND CHRISTIE HALIJAN<br><br>APPELLEES | Opinion Delivered November 5, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION [NO. 60CV-22-4201]<br><br>HONORABLE MORGAN E. WELCH, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Appellants Dustin Keathley d/b/a DSR Construction and Patsy Keathley (the "Keathleys") appeal a final judgment entered by the Pulaski County Circuit Court in case No. 60CV-22-4201 on June 3, 2024, in favor of appellees Dean Halijan and Christie Halijan (the "Halijans") awarding them $177,171.16 in damages as the prevailing party in a breach-of-contract case. The sole question on appeal is whether the circuit court erred in applying the cost-of-repair measure of damages in awarding the Halijans damages for the Keathleys' defective construction.[1] We affirm.

---

[1]This appeal coincides with the Keathleys' related appeal pending before this court in case No. CV-25-5, 2025 Ark. App. 532, ___ S.W.3d ___, which seeks to reverse the award of attorney's fees if we reverse the underlying judgment in this appeal.

## I. *Facts and Procedural History*

The Halijans hired the Keathleys to build a custom home on a lot owned by the Halijans. After initial design and budget discussions, Patsy Keathley drafted a two-page document called "Contractor Agreement for New Construction" and delivered it to Dean Halijan on or about November 17, 2020. The Halijans made one addition on page two of the document, and thereafter, on November 23, the Keathleys and the Halijans signed the contract (the "Contract").

In the Contract, the Keathleys and the Halijans agreed in part to the following:

(1) Dustin Keathley, doing business as DSR Construction, is the "Contractor."

(2) Patsy Keathley is the "Project Manager."

(3) Christie and Dean Halijan are the "Owner."

(4) The Contractor's flat fee amount is $52,000.

(5) Construction at the address of . . . Little Rock, AR will begin within 10 business days from the date of the final approval of a construction loan and is expected to be completed by 06-30-2021.

(6) All parties agree time is of the essence.

(7) All work will be completed in a workmanlike manner. It is the responsibility of the Contractor to hire all subcontractors. All negotiations and construction practices will be organized exclusively by the Contractor or Project Manager. The Contractor agrees to make every effort to obtain the best pricing possible in all areas of construction for this project.

(8) Any material or subcontractor may be rejected by the Owner, at his discretion, for any reason. If the Owner rejects any material or subcontractor, then an adjustment in the timeline and scheduled completion date will be subject to change.

(9) The Owner agrees to apply for a construction loan within 3 days of the signing of this agreement. A construction loan must be in place prior to any excavation being done at the address. A Cost Breakdown and Specification Sheet will be submitted to the Owner, and in turn forwarded to the Lender, along with a copy of this agreement and an official set of blueprints. The Cost Breakdown and Specification Sheet are tools, to be used as a guideline. They are created to organize the allocation of building costs to the correct category, to assist in tracking expenses and to describe the materials to be used on this project. The Cost Breakdown is not a bid. Estimates and allowances are not a promise or guarantee of actual cost in any area of the construction of this project.

(10) The Owner's lender will make inspections and report the current "percentage of progress" made on the project each month. Monthly draws to the Contractor will be made based on these percentages. The Contractor agrees to use his open supplier accounts to allow any materials used for the purpose of construction on this project address to be charged to his accounts. Invoices will be supplied to the Owner at the END of each month, between the 25th and the 31st. Construction draws will be requested by the Contractor on the 1st of each month. The Lender should make his inspection by the 5th in order for the Contractor to receive to receive the approved funds before the 10th. This timeline will ensure the Contractor can draw funds and in turn pay accounts in full, therefore maintaining good standing of open credit lines with suppliers. The Owner understands actual invoices and percentage of progress may not be identical each month. Any excess amount drawn will be retained and used by the Contractor to pay subcontractors all through the month, then those invoices will be submitted to the Owner at the end of the month.

(11) In addition, the Flat Fee Amount agreed to above will be divided into monthly payments which are due on the 1st and payable by the 5th of each month to the Contractor. The first payment will be $4,000 due on December 1, 2020. The second-fifth payments will be $8,000 due by the 5th of each month January through May, 2021, provided that construction starts in January. The final payment of $8,000 due after the final Certificate of Occupancy is issued and prior to closing.

(12) The entire Flat Fee Amount and all outstanding invoices will be required to be paid in full before a closing shall occur. In the event the Owner refuses to pay outstanding invoices due all Arkansas mechanics liens and other applicable liens may be pursued by the Contractor or any subcontractor.

The Halijans paid the first installment of the contractor's flat fee in the amount of

$4,000 in December 2020 as required by the Contract. The Keathleys began construction

on the residence in early January 2021 after the Halijans' construction loan was approved and funded on January 4, 2021.

Pursuant to the terms of the Contract, the Keathleys proceeded with construction, acquired materials on Dustin Keathley's supplier accounts, engaged subcontractors to perform the construction work, and submitted monthly payment applications to the Halijans.

At trial, the Halijans introduced five payment applications from the Keathleys and the corresponding backup invoices included for each payment application as plaintiffs' exhibits 22 through 26. The payment applications reflected all the work performed and materials delivered to the project by the Keathleys.

The Keathleys continued construction until early June 2021 when a retaining wall that was under construction collapsed during heavy rainfall. The wall collapse was significant enough to pause any ongoing work on the residence as the parties considered solutions to—and responsibility for—the collapsed retaining wall. Ultimately, the parties were unable to agree on a resolution, and the Halijans terminated the Contract.

The Halijans hired another builder who completed the project for them. On June 29, 2022, they filed suit against the Keathleys seeking judgment for the cost of repairing the items they alleged the Keathleys defectively built. The Halijans also sought judgment for other consequential costs incurred by them, including increased loan interest caused by the delayed completion and tax penalties paid by the Halijans for utilizing tax-deferred accounts

to fund the remainder of the construction. Finally, the Halijans also sought judgment for a portion of the contractor's fee that they paid to the replacement builder.

The Halijans' complaint alleged two counts: (1) breach of contract and (2) negligent construction. The Keathleys defended primarily on the basis that the Contract was not a fixed-price contract that obligated them to deliver a defect-free home for a sum certain amount.

A bench trial was held over a three-day period from April 30 through May 2, 2024. The circuit court found that the Halijans had presented substantial evidence of the Keathleys' faulty workmanship on the home. The circuit court also found that the Keathleys abandoned work on the residence and failed to complete the performance of the contract work in a timely manner.

The circuit court found that the measure of damages in this case is the cost of repairing the defective construction so that the homeowner recovers an amount that will repair the home to the quality expected when the parties entered into the Contract. The circuit found that the Halijans were entitled to judgment in the following amounts: (1) $186,295 for amounts expended in repairing defective construction; (2) $18,082 for the difference between the unpaid portion of the builder's fee in the Keathleys' Contract and the builder's fee paid to the other contractor to complete the residence; (3) $14,858 in interest expenses; and (4) $4,200 in penalties. The circuit court reduced the judgment by $46,263.39 for amounts paid by the Keathleys in the construction of the residence that were never reimbursed by the Halijans. The final judgment entered on June 3 in favor of the

5

Halijans totaled $177,171.61. The Keathleys filed a timely notice of appeal on June 4, and this appeal followed.

II. *Standard of Review and Applicable Law*

In civil bench trials, the standard of review on appeal is whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Layman Lane, LLC v. Suburban Sewer Improvement Dist. #239*, 2024 Ark. App. 509, at 15, 699 S.W.3d 423, 431. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been made. *Id.*, 699 S.W.3d at 431–32. However, questions of law are reviewed de novo on appeal. *Keith Capps Landscaping & Excavation, Inc. v. Van Horn Constr., Inc.*, 2014 Ark. App. 638, at 6, 448 S.W.3d 207, 210.

The circuit court noted in the final judgment that it is well settled that Arkansas courts recognize two alternative methods for measuring damages in construction-defect cases: (1) the cost-of-repair or (2) the difference in fair market value. *Carter v. Quick*, 263 Ark. 202, 208, 563 S.W.2d 461, 464 (1978); *Pennington v. Rhodes*, 55 Ark. App. 42, 50, 929 S.W.2d 169, 173 (1996). In Arkansas, the cost-of-repair measure of damages is preferred "because it gives the landowner a money equivalent of what he bargained for by giving him the cost of getting the work done properly." *Bowman v. McFarlin*, 1 Ark. App. 235, 239, 615 S.W.2d 383, 385 (1981); *see also Pennington*, 55 Ark. App. at 50, 929 S.W.2d at 173. Under the cost-of-repair measure of damages, the homeowner is entitled to recover the cost of repairing the

defective construction. *See Carter*, 263 Ark. at 208, 563 S.W.2d at 464; *Pennington*, 55 Ark. App. at 50, 929 S.W.2d at 173.

The cost-of-repair approach is the appropriate measure of damages "whether the breach of the contract is large or small," and "it should be applied in every case, except where the actual curing of the defects would cause unreasonable economic waste." *Carter*, 263 Ark. at 209, 563 S.W.2d at 465. This standard is properly applied,

> *even when the value of a newly constructed but defective house exceeds the contract price*, because the owner's interest is in having defective construction corrected so that he and his family may enjoy a properly constructed dwelling and he is not concerned with offsetting any loss on a possible resale of the property.

*Pennington*, 55 Ark. App. at 54–55, 929 S.W.2d at 175–76 (emphasis added).

### III. *Discussion*

The Keathleys argue that the circuit court erred in applying the *Carter* measure of damages to the Halijans' claims. They maintain that the circuit court's judgment is premised on an error of law: that a contractor is liable for all repair costs related to construction defects even if the parties' contract is not a fixed-price contract. The Keathleys urge that because the judgment put the Halijans in a better position than they contracted for, it must be reversed.

The parties' Contract details what their respective contractual obligations are, and it is undisputed that it is unambiguous. The Contract requires the Keathleys to build the Halijans a home in a workmanlike manner, and it requires the Halijans to pay the costs of the construction plus a fixed builder's fee of $52,000.

7

When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the written agreement according to the plain meaning of the language employed. *Lee v. Bolan*, 2010 Ark. App. 209, at 8–9, 374 S.W.3d 718, 724. The Halijans sued the Keathleys, arguing that the Contract required them to build the home in a workmanlike manner free from negligent defects and then alleging that the Keathleys breached that duty by building the home with construction defects. The circuit court's judgment found in favor of the Halijans and awarded judgment against the Keathleys for the costs of repair.

In its judgment, the circuit court, citing *Carter*, 263 Ark. at 209, 563 S.W.2d at 465; and *Pennington*, 44 Ark. App. at 50, 929 S.W.2d at 173, specifically notes that "[i]n Arkansas, the preferred measure of damages in construction contract cases involving new structures is the cost of repairing the defective construction so that the homeowner recovers an amount that will repair the house to the quality expected when the parties struck their bargain."

The Keathleys maintain that *Carter* and *Pennington* should not apply because those cases involved contracts in which the homebuilder contracted to build and deliver a home built in a workmanlike manner and free of defects for a fixed contract price. Accordingly, when the contractors in *Carter* and *Pennington* entered into the contracts, they accepted the risk of delivering a properly built home for a fixed sum of money. But here, where the Contract did not provide that the Keathleys would deliver the home for a fixed purchase price, they maintain that the logic of *Carter* and *Pennington* breaks down.

The Keathleys argued before the circuit court that if they were liable for damages under the Contract, they should be liable only for the increase in costs that was caused by their alleged breach—the otherwise-avoidable expenses the Halijans incurred because of their alleged breach. But the Keathleys neither allege nor argued below that their initial cost estimates were low or that the work contemplated under the Contract was not possible to complete at the estimated price. This is not a situation in which the Keathleys undervalued the cost to build, and their deficient performance necessitated that items be fixed, supplemented, or wholly redone.

The record before us indicates that most of the Halijans' costs in this case were incurred as a direct result of their efforts to remedy the Keathleys' deficient workmanship. Awarding damages on the basis of costs of repair is not inconsistent with Arkansas law. Despite the Keathleys' reliance on cases from other jurisdictions to support their proposition that the Halijans were always going to be the party responsible for the costs of building a home in a workmanlike manner and that the Keathleys did not become responsible for part of those costs because they rendered allegedly defective performance, the circuit court remained convinced that the *Carter* and *Pennington* holdings applied without qualification to the parties' Contract.

The Halijans did not *expect* the Keathleys' performance under the Contract to be so defective that the Halijans would be forced to pay a third party to tear out and remediate much of the work the Keathleys performed, as was the case here. Rather, the Halijans expected the project to be completed in a workmanlike manner. We need not look to other

9

jurisdictions given that the law in Arkansas is well established and supports a conclusion that the Halijans were properly awarded the cost of repairing the Keathleys' defective workmanship, which were costs the Halijans would not have incurred but for the Keathleys breach.

We hold that the cost-of-repair standard is the proper measure of damages in this construction-defect case irrespective of the nature of the underlying Contract and fee arrangement between the parties. Cost-plus contracts are not a novel concept and have been recognized and discussed by Arkansas courts for at least a century. *See, e.g.*, *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 25, 280 S.W.3d 1, 10 (2008); *Garco v. Hanks*, 214 Ark. 882, 883, 218 S.W.2d 378, 379 (1949); *Wells v. Griffin*, 266 Ark. 763, 767, 586 S.W.2d 239, 241 (Ark. App. 1979). We disagree with the Keathleys' position that this case presents a novel issue. At no time during which Arkansas courts have employed the cost-of-repair measure of damages for construction-defect cases, while simultaneously recognizing the construction industry's utilization of cost-plus contracts, have our courts indicated that a different standard should apply regarding cost-plus contracts.

The application of the cost-of-repair measure of damages does not result in the Halijans receiving a windfall. To the contrary, applying the cost-of-repair measure in this case is consistent with the fundamental public policy that the goal of awarding damages for breach of contract is to place the injured party in as good a position as he would have been had the contract been performed. *See Carter*, 263 Ark. at 208, 563 S.W.2d at 464. Both this court and the Arkansas Supreme Court have expressly noted that the cost-of-repair measure puts

the homeowner in the same position he would have been but for the breach. *Id.*; *see also Pennington*, 55 Ark. App. at 52, 929 S.W.2d at 174.

The record before us demonstrates that the Halijans took care not to seek damages for additions or upgrades to the home, and the circuit court did not award them such damages. The evidence supports the circuit court's award of damages under the cost-of-repair measure as damages that are the direct result of the Halijans rectifying the Keathleys' defective workmanship—not costs that the Halijans would have paid regardless to complete the project. As is the case here, because "defects attributable to the workmanship of the appellee [can] be adequately and reasonably repaired, . . . the proper measure of damages [is] the cost of such repair." *Taylor v. Richardson*, 266 Ark. 447, 451, 585 S.W.2d 934, 936 (1979). The Halijans would not have undertaken the remedial work if the Keathleys had properly performed the work on the home.

We likewise find no merit in the Keathleys' argument regarding the parties' subjective understanding of the terms of the Contract and labels used therein, which asks us to second-guess the factual findings of the circuit court and the weight and credibility it afforded the witnesses, which we will not disturb. *See D&D Parks Constr. Co., Inc. v. Martin*, 2012 Ark. App. 343, at 9, 414 S.W.3d 402, 407 (noting that the circuit court, as fact-finder, is in a superior position to determine the credibility of the witnesses).

Because the record supports the circuit court's findings regarding both the measure of damages applied as well as the amount awarded to the Halijans as a result of the Keathleys'

11

defective workmanship on the construction of their home pursuant to the terms of the Contract, we affirm.

Affirmed.

HIXSON and MURPHY, JJ., agree.

*Mann & Kemp, PLLC,* by: *Harrison Kemp,* for appellants.

*Gill Ragon Ownen, P.A.,* by: *Matthew B. Finch* and *Hannah W. Howard,* for appellees.