2012 Ark. App. 657

**Jan HENDERSON, Appellant**

**v.**

**Dan HARBISON d/b/a Dan Harbison Construction, Appellee.**

**No. CA 12–393.**

Court of Appeals of Arkansas.

Nov. 14, 2012.

Kent Tester, P.A., Clinton, by: Kent Tester, for appellant.

Morgan Law Firm, P.A., Clinton, by: M. Edward Morgan, for appellee.

RITA W. GRUBER, Judge.

This case arises from a complaint filed by appellee Dan Harbison against appellant Jan Henderson for breach of contract. Appellant filed counterclaims for negligence and breach of warranty. At the close of the evidence in a jury trial, the circuit court granted appellee's motion for directed verdict on appellant's counterclaims. The jury then returned a verdict in favor of appellant on appellee's complaint. Appellant appeals from the court's determination granting appellee's motion for a directed verdict on her counterclaims. We affirm the circuit court's decision.

The facts leading up to appellee's complaint began on February 4, 2008, when appellant's home in Clinton was damaged by a tornado. Trees fell on the house causing roof damage, windows were blown out, and rain inside the home caused damage to the sheet rock and flooring. On the day of the tornado, appellant was an English teacher in South Korea but happened to be on her way back to Arkansas for vacation. On March 3, 2008, appellant and appellee, who did business as Dan Harbison Construction, entered into a contract pursuant to which appellee agreed to repair appellant's home for $80,000. The agreement was amended when appellant requested appellee to do additional work, for a total agreed price of $90,514. Appellant returned to South Korea on March 5, 2008, leaving her brother Bill in charge of paying appellee for his work. Bill wrote checks totaling $80,000 before appellant returned from South Korea. The contract did not specify a date on which the work was to be completed.

Appellee testified that he delayed completion to allow appellant to return and pick paint colors for the inside of the home. In August 2008, appellant returned and chose the paint colors and flooring. Appellee continued to work on the home in the fall, and appellant moved in during the middle of November before the work was completed. It was not clear from the testimony whether appellee requested appellant to make a "punch list" for items that needed to be finished or repaired or whether appellant made the list without prompting, but a list of twenty-five items that needed to be accomplished in order for the job to be complete was introduced into evidence. The list included things like "utility room door doesn't close, floor rounds needed between tiled areas and laminate areas, w/d cleaned and installed, trash taken out, breakfast room screen torn," and "board over sink in kitchen missing." Many of the items had an "X" over the number of the item or were crossed through. Appellee testified that he was attempting to go through the list and complete the home; appellant testified that appellee was not completing the home. In December 2008, when appellee came to the house to work, appellant testified that she told him that she had "had enough" and not to come back. She said she did not need his services anymore.

On April 15, 2009, appellee filed a complaint against appellant alleging breach of contract, contending that appellant failed to pay him the remaining $10,514 she owed under their agreement. On November 30, 2009, appellant filed a counterclaim, alleg-

ing negligence and breach of warranty. The court held a jury trial on December 7, 2011.

Appellant presented five witnesses in support of her counterclaim. The first witness, Tracy Dolan, was an electrical inspector for the State of Arkansas. She testified that she conducted a random inspection of appellant's home in October 2008. She said that the electrical receptacles and switches in the home had all been removed and the wiring was "hanging out." Appellee told Ms. Dolan that the homeowner was going to replace the missing switches and receptacles. Ms. Dolan did not testify that anything was done improperly on the house.

Appellant testified that, although the agreement did not contain a completion date, she wanted to be in the house by November 10, 2008. So she moved in on that date, before appellee had finished working on the home. She testified that she wrote the "punch list" over the Thanksgiving holiday and gave it to appellee on the Monday after Thanksgiving. She testified that her house stayed much colder than it did before the tornado, that some of the wire "closet things" were falling down, that she thought the closet doors were "cheaper," that the painter was not careful, that she had to purchase a new entryway light because it had been incorrectly hung, and that one of her kitchen cabinet doors had fallen off. She also introduced dozens of photographs of problems with the home. The photos were from a variety of dates, including March 2009, July 2010, and December 2011. She admitted on cross-examination that she did not know what parts of the home appellee worked on because she was not there at the time. She testified that she terminated appellee the week after Thanksgiving.

Martin Schenck, who repaired a cast-iron plumbing pipe for appellant in August 2009, testified that the pipe was leaking and cracked and had been wrapped in duct tape when he saw it. He did not know how long it had been wrapped or leaking. Sidney Dale Smith, an electrician for Petit Jean Electric, testified that he conducted an energy audit for appellant on her home and discovered that it was colder around the corners of the outside of the home. He thought that air might be getting in at the back of the house. He did admit that it was typical for older homes. Appellant's home was built in 1973.

Appellant's last witness was Steve Owenson, who inspected appellant's home in the summer or 2010. Appellant did not give him a copy of the contract between her and appellee but merely asked Mr. Swenson to conduct a home inspection. His inspection included anything that was wrong with the home, whether it was an item repaired by appellee or work that had been performed years before. He testified that R–38 insulation (which was specified by the contract) should be twelve inches thick and that the insulation in appellant's home was only six inches thick. He also testified that he did not see proper vents in the attic. He said that some of the cabinet doors in the kitchen and bathrooms did not fit, some of the hinges were slightly bent, and the paint scratched off easily. He also found problems with the laminate flooring, and he noted that one of the electrical receptacles was dead and that there was an open wire in one of the kitchen cabinets. Finally, he testified that the floor was higher in some rooms than in others and that he did not know if the house was originally built that way. On cross-examination, Mr. Swenson admitted that a lot of the problems on his list would typically have been corrected when a contractor finished a job, and that it would be a lot more difficult and costly to make the repairs over a year later. He did not

know that appellee had not been allowed to finish the job and stated that he would have been concerned had he built a home and then not been given an opportunity to finish the job.

At the close of all of the evidence, appellee moved for a directed verdict on appellant's counterclaims, arguing that no one testified as to specifically what appellee failed to do. Appellant was in South Korea when the work was performed, and Mr. Swenson had never seen the parties contract and presented no testimony about appellee's failure to comply with the contract. Moreover, appellee argued that no one testified regarding the standard required of a builder or regarding appellee's failure to operate within that standard. The court granted the motion, stating that he did not think appellant had carried her burden on either negligence or breach of warranty. The jury then returned a verdict on appellee's claim of breach of contract in favor of appellant. Appellee did not appeal the jury's verdict, appellant appealed the dismissal of her counterclaim.

 In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Buckeye Retirement Co. v. Walter*, 2012 Ark. App. 257, at 5, 404 S.W.3d 173, 176–77. A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.* Evidence is insubstantial when it is not of sufficient force or character to compel a conclusion one way or the other or if it does not force a conclusion to pass beyond suspicion or conjecture. *Curry v. Thornsberry*, 81 Ark.App. 112, 118, 98 S.W.3d 477, 481 (2003).

Appellant contends that the trial court erred in granting a directed verdict on her claims of negligence and breach of warranty against appellee. We disagree and we affirm the court's decision.

 We turn first to appellant's counterclaim for negligence. The parties agree that, under Arkansas law, a contractor is held to both the standard of care of the contracting industry as well as to the standard of care of a reasonably prudent person. *See Dixon v. Ledbetter*, 262 Ark. 758, 760, 561 S.W.2d 294, 295 (1978); AMI Civ. 1203, 302, 303, 305 (2012). The standard of care for the industry is "the degree of skill and care ordinarily possessed and used by contractors doing work similar to that shown by the evidence." AMI Civ. 1203 (2012). Further, to establish a prima facie case of negligence, appellant must have shown that appellee was negligent and that his negligence was the proximate cause of the damages. *Kroger Co. v. Smith*, 93 Ark.App. 270, 273, 218 S.W.3d 359, 362 (2005).

 Appellee was hired to repair tornado damage to appellant's thirty-five-year-old home. He was not hired to repair every defect that existed in her home, whether caused by the tornado or by the wear and tear of thirty-five years. Appellant returned to South Korea before appellee started on the work, and she remained there for six months. When she returned in August, she picked the paint colors and flooring and appellee continued his work on her home. Appellant terminated appellee in November before he had completed the job.

Although appellant presented witnesses who testified about a variety of defects and problems in her home, no witness testified whether the defects were caused by the tornado; appellee's repairs, or normal wear and tear from thirty-five years. No one testified that appellee failed to per-

form work that he was required to perform. Mr. Schenck testified that he replaced a leaking pipe, but he could not testify regarding how long the pipe had been leaking or whether the leak was caused by faulty repairs of the tornado damage. Mr. Smith testified that his thermal scan of appellant's home indicated that air might have been infiltrating the rear of the home, but he admitted that it was typical of older homes. He did not testify about appellee's duty regarding this issue or his failure to do something that he had a duty to do.

Mr. Swenson testified that he was hired to perform a home inspection—more than a year and a half after appellant terminated appellee. Further, Mr. Swenson had never seen the contract between the parties and had no idea what appellee was hired to repair. He admitted that many of the defects he found in his inspection would typically have been fixed when a contractor was finishing the job.

Appellant and appellee testified that appellant did not allow appellee to finish the job. No one testified that appellee's work fell below the standard of care for a contractor doing similar work or that his failure to do something proximately caused the defects discovered in the home. Therefore, we affirm the circuit court's determination that the evidence presented was not of sufficient force or character to compel a conclusion one way or the other.

■ In addition to making a claim for negligence, appellant's counterclaim alleged that appellee's "defective supervision, construction and repair is a breach of the implied and actual warranties of habitation and good workmanship." At the close of the evidence, in response to appellee's motion for directed verdict, appellant's attorney stated "for the record" that he was not "going to go forward on the implied warranty of the warranties part, so I'm not going forward on warranties. But just on the negligence in the contract. Breach of contract." Appellee argues here, and we agree, that appellant did not make a claim for breach of contract and thus may not do so here. It appears that she abandoned her breach-of-warranty claims, but we affirm the court's decision directing a verdict on the warranty claims in any case.

■ The contract between the parties stated that all work would be performed in a "workmanlike manner according to standard practice." First, appellant failed to present any evidence regarding what constituted this "standard practice" or any testimony that appellee's work was unacceptable under this standard. Moreover, appellant admitted that she terminated appellee and did not allow him to "cure" the alleged defects caused by his work. To preserve a breach-of-warranty claim against a contractor, the plaintiff must have given the contractor some notice of the allegedly defective condition and a sufficient opportunity to inspect the premises and correct the defects. *Cinnamon Valley Resort v. EMAC Enters., Inc.,* 89 Ark. App. 236, 243, 202 S.W.3d 1, 6 (2005). Accordingly, we affirm the circuit court's determination directing a verdict on appellant's breach-of-warranty claims.

Affirmed.

GLADWIN and GLOVER, JJ., agree.